CARLSON, Presiding Justice,
for the Court:
¶ 1. Howard Goodin appeals from the Newton County Circuit Court’s denial of his application for post-conviction relief. The circuit court denied Goodin’s claims that he was mentally retarded and that he had received ineffective assistance of counsel on the issues of mental illness and competency. After review of the record and pertinent authorities, this Court finds that the circuit court erred in determining that Goodin was not mentally retarded. We also find that Goodin failed to prove ineffective assistance of counsel regarding competency at the conviction stage. Because these issues are dispositive, we will not address Goodin’s claim of ineffective assistance of counsel on the issue of mental illness. The judgment of the Newton County Circuit Court is affirmed in part and reversed and rendered in part. The circuit court’s sentence of death is vacated and this case is remanded to the Circuit Court of Newton County for resentencing on the charge of capital murder.
FACTUAL AND PROCEDURAL HISTORY
¶ 2. Goodin has a long criminal history and a nearly lifelong history of at least suspected mental illness. Due to the importance of this case, to Goodin personally and the legal system as a whole, the following lengthy recitation of the facts is imperative. We first note that the clinical definition of mental retardation requires (1) subaverage intellectual functioning (2) accompanied by significant limitations in at least two adaptive skills (3) that manifest before age eighteen. Atkins v. Virginia, 536 U.S. 304, 318, 122 S.Ct. 2242, 2250, 153 L.Ed.2d 335 (2002); Chase v. State, 873 So.2d 1013, 1027-28 (Miss.2004).
A. Criminal Background
¶ 3. Goodin was born in 1954. One psychologist reported that Goodin’s records indicated that he had been “uncontrollable since 1966,” which would have been age twelve. He had a history of irregular *1105 school attendance, disobedience to authority, and breaking into houses. His sister testified that he was sent to Oakley Training School (Oakley) by a Neshoba County youth court. Goodin’s criminal history as an adult includes convictions for the following crimes: burglary in 1973; second-degree sexual assault, robbery, and burglary in 1977; armed robbery in 1980; aggravated assault, armed robbery, attempted armed robbery, and assault on a law enforcement officer in 1982; and burglary in 1995. Goodin v. State, 787 So.2d 639, 643 (Miss.2001). In 1999, Goodin was convicted of capital murder and sentenced to death. Id. It is that judgment of conviction and sentence which is the subject of this appeal.
B. History of Mental Illness
¶4. In February 1971, when he was sixteen years old, Vocational Rehabilitation at Oakley referred Goodin to Dr. Randall Thomas for a psychological evaluation. The purpose of the referral was to determine whether Goodin’s objective of being a heavy-equipment operator was feasible. Goodin was administered the Weschler Adult Intelligence Scale (WAIS), the Bender Gestalt Motor Test, the Gray Oral Reading Test, the Wide-Range Achievement Test, and the Rorschach Personality Test. According to the WAIS test, Goo-din’s full-scale IQ score was 62, with a verbal IQ score of 75 and a performance IQ score of 49. Dr. Thomas’s preliminary diagnostic impression was “schizoid personality traits with mild mental retardation.” He concluded that Goodin “would have difficulty achieving his vocational objective of being a heavy equipment operator.”
¶ 5. By age nineteen, Goodin was incarcerated at Parchman after pleading guilty to a charge of felony shoplifting. In July of 1973, he was referred for a psychological examination by Vocational Rehabilitation personnel. Goodin was administered the WAIS, the Bender Gestalt, the Wide-Range Achievement Test, the 16 Personality Factor Test, and the House-Tree-Person Test. The tests were administered by Tommy Terrell, a rehabilitation psychologist, who was supervised by Dr. Billy Fox. Goodin scored a verbal IQ of 67, a performance IQ of 62, and a full-scale IQ of 63. His reading and spelling was at a third-grade level. The diagnostic impression was moderate mental retardation and behavioral disorder.
¶ 6. In May 1998, just before his release from Parchman on the 1995 burglary conviction, Goodin was evaluated by Dr. Michael Whelan, a psychologist. This report appeared to be in support of a claim for disability that Goodin had filed with the Social Security Administration. The report noted that Goodin had reported auditory hallucinations for the past three to five years and had been treated with Mel-laril and Haldol, two antipsychotics. Dr. Whelan estimated that Goodin’s IQ was in the mid-seventies and that his math and reading abilities were at a fifth-grade level. Dr. Whelan did not think Goodin was competent to manage money if he was to receive benefits. Dr. Whelan’s conclusion was that Goodin suffered from chronic paranoid schizophrenia.
¶ 7. After his release from the Mississippi Department of Corrections (MDOC), Goodin was seen at Laird Hospital in Union, Mississippi, in July and August of 1998. He complained of hearing voices. Goodin was treated with Risperdal, a medication for schizophrenia. Also in July of 1998, Goodin was treated at the Weems Community Mental Health Center in Meridian for complaints of auditory and visual hallucinations. His diagnosis was schizophrenia, undifferentiated type. By this *1106 time, Goodin’s claim for disability had been approved.
¶ 8. In November 1998, Goodin had been out of prison for five months when he was arrested for the armed robbery and murder of Willis Rigdon. Goodin, 787 So.2d at 642^43. Attorneys Robert Brooks and Shawn Harris were appointed to represent Goodin. In December 1998, Brooks filed a Motion for Psychiatric Examination, alleging that Goodin was “of insufficient soundness of mind” and “not capable of making a rational defense.” The trial court granted the motion and ordered Goodin to be evaluated by clinical psychologist Dr. Gerald O’Brien and psychiatrist Dr. Donald C. Guild.
¶ 9. Dr. O’Brien saw Goodin in January and February of 1999. He administered the WAIS-Revised, the Shipley, the Wide Range Achievement Test-Revision 3, the Stroop Neuropsychological Test, the Trail-making Tests, the Luria-Nebraska Screening Test, the 21 Word Test, and the Structured Interview of Reported Symptoms. Goodin’s verbal IQ score was 65, performance IQ score was 60, and full-scale IQ score was 60. According to Dr. O’Brien, this placed Goodin “intellectually in the mildly retarded range, if taken at face value.” However, it was Dr. O’Brien’s opinion that Goodin’s “degree of apparent effort and motivation strongly suggest[ed]” that his scores underestimate[d] his level of functioning.” Dr. O’Brien made similar comments concerning Goodin’s effort on the other tests. As to the 21 Word Test, Dr. O’Brien stated, “[t]his pattern is characteristic of individuals who are feigning a mental disorder, and is rarely seen in those responding truthfully.” Based on all the information that he had available, Dr. O’Brien concluded that Goodin “[did] not exhibit a psychosis or other significant psychological disorder which would affect his understanding [of] the nature and quality of his actions, including whether they were right or wrong, and conforming his behavior to the requirements of the law.” Finally, Dr. O’Brien reported that Goodin “appealed] to be competent to stand trial and to assist in his own defense.”
¶ 10. Dr. Guild saw Goodin in January 1999 and, like Dr. O’Brien, Dr. Guild determined that Goodin was competent to stand trial. His report stated:
Suffice it to say that Mr. Goodin did very well in the interview. He indicated that although he had a mental problem and had hallucinations, possible delusions, that these had nothing to do with the current charge. He indicates that he was strictly innocent of the current charge, and gives his whereabouts as somewhere else, but states his mental illness had no part of it.
He does have good street knowledge of the criminal justice system, and seems quite confident [sic ] to assist his attorney in his defense. He is able to talk about the charges against him, the evidence against him, and how it might be countered.
I have written to his doctor and I am going to restart him on his anti-psychotic medications. Once I get those records, with Dr. O’Brien perhaps wishing to retest him after that. But even without medications, he remains responsible for his action at the time of the alleged crime, and also is competent to stand trial.
On March 16, 1999, the district attorney sent Goodin’s counsel a copy of Goodin’s medical records from MDOC, which included reports by Dr. Stanley C. Russell from 1996 to 1998 showing regular prescriptions of the antipsychotic Haldol.
*1107 C. Procedural History
¶ 11. In May 1999, Goodin was convicted of the capital murder of Willis Rigdon and sentenced to death. Goodin’s conviction and sentence were affirmed by this Court on direct appeal. See Goodin v. State, 787 So.2d 689 (Miss.2001), cert. denied, 585 U.S. 996, 122 S.Ct. 1558, 152 L.Ed.2d 481 (2002). Goodin filed an Application for Leave to File Petition for Post-Conviction Relief with this Court in April 2002, to which he attached an affidavit from Dr. O’Brien. Dr. O’Brien stated that he had conducted his competency evaluation of Goodin in 1999 with only documents supplied by the State, but he had since reviewed additional materials supplied by Goodin, including records showing Goodin to be schizophrenic. Dr. O’Brien said these records would have been significant to his forensic evaluation, “not just in terms of determining whether Mr. Goodin was mentally ill but also for assessing whether he was mentally retarded.”
¶ 12. Dr. O’Brien stated that Goodin had an IQ of 60, in the mildly mentally retarded range, but he had suspected at the time that Goodin was malingering; however, he might have reached a different conclusion if he had known of the records in question. Dr. O’Brien said Goo-din’s school and social security records were significant in a determination of retardation. He opined that Goodin should have been treated for schizophrenia and then reevaluated and retested. He said that it was difficult to evaluate mental retardation in a person also suffering from mental illness. Dr. O’Brien “strongly recommended that Mr. Goodin receive a thorough evaluation both to thoroughly assess his mental illness and to determine whether he is mentally retarded.” He concluded, “Based on the records and my prior testing, I believe that there is a significant likelihood that Mr. Goodin may in fact be mentally retarded.”
¶ 13. This Court granted Goodin’s Application for Leave to File Petition for Post-Conviction Relief on the following issues: (1) whether he was mentally retarded; (2) whether his trial counsel had been ineffective on the issue of Goodin’s alleged mental illness; and (3) whether trial counsel had been ineffective on the issue of competency. Goodin v. State, 856 So.2d 267, 284-85 (Miss.2003). In October 2003, the Newton County Circuit Court ordered that Goodin be examined by doctors at the Mississippi State Hospital (Whitfield). In March 2004, Goodin was examined by Dr. Reb McMichael, Dr. Paul Deal, Dr. John Montgomery, and Dr. Charles Harris. The interviewers reviewed Goodin’s past medical records. They interviewed Goodin for approximately one hour and forty-five minutes. Goodin also received psychological testing. On the WAIS-III, Goodin received a verbal IQ score of 56, a performance IQ score of 56, and a full-scale IQ score of 52.
¶ 14. The finding of the Whitfield doctors was that Goodin was not mentally retarded as contemplated by Atkins v. Virginia. They found that Goodin had the “sufficient present ability to consult with his attorneys with a reasonable degree of rational understanding in the preparation of this post-conviction relief, and that he [had] a rational, as well [as] a factual understanding of the nature and object of these legal proceedings,” and that he had “the present capacity to understand and knowingly, intelligently, and voluntarily to waive or assert his constitutional rights.” They found that Goodin had exaggerated his limitations in past testing and that his use of language and his ability to learn and apply basic legal concepts was incompatible with someone who was genuinely mentally retarded.
*1108 ¶ 15. The Newton County Circuit Court held an evidentiary hearing on this matter on October 12, 2004. Goodin was represented by Robert Ryan of the Office of Capital Post-Conviction Counsel, and he presented one witness, his sister, Ada T. Reese. Goodin rested at the conclusion of Reese’s testimony. The State moved for a directed verdict, arguing that Goodin had failed to comply with the requirements of proving mental retardation as announced by this Court in Chase v. State. The circuit court granted the motion, finding that Goodin had failed to meet his eviden-tiary burden on the issue of mental retardation. The circuit court subsequently found that Goodin had a mental intelligence quotient of 70-75 and that he was not mentally retarded under Atkins and this Court’s ensuing decisions. The circuit court further found that Goodin’s claims of ineffective assistance of counsel were “rendered moot and overruled.” Goodin subsequently filed a Motion for New Evidentia-ry Hearing, which was dismissed.
¶ 16. Goodin appealed to this Court once again. By en banc order dated August 25, 2009, this Court found that, “through no fault of the trial court, this Court’s mandate in Goodin has not been carried out.” We vacated the dismissal of Goodin’s petition for post-conviction relief and remanded for a full evidentiary hearing on the issues of (1) mental retardation, (2) ineffective assistance of counsel on the issue of mental illness, and (3) ineffective assistance of counsel on the issue of competency.
¶ 17. In January 2010, Goodin was the subject of a neuropsychological evaluation by Dr. Tora Brawley, a clinical psychologist with a specialty in neuropsychology. She reviewed Goodin’s past records and evaluations and administered several tests, including the WAIS-III. Goodin’s full-scale IQ score was 64, with a verbal IQ score of 69 and a performance IQ score of 68, “placing him in the Extremely Low/Mentally Retarded range of intellectual functioning.” Dr. Brawley found “no evidence of an attempt to malinger or exaggerate cognitive deficits.” She found that the 2004 Whitfield evaluation contained “multiple errors noted in administration, scoring[,] and interpretations of several of the measures administered, to include the malingering measures.” Dr. Brawley’s clinical assessment of Goodin was “consistent with mental retardation, brain organicity[,] and a psychotic disorder.”
¶ 18. Goodin also was examined in January 2010 by Dr. Donna Schwartz-Watts, a forensic psychiatrist. Dr. Schwartz-Watts reviewed Goodin’s past records and evaluations. She noted Goodin had done poorly in school, had spent three years in third grade, had failed fourth grade, and had dropped out in sixth grade at age fifteen. She noted that he had a family history of mental illness. Her diagnosis was schizophrenia, chronic undifferentiated type, and mild mental retardation. She opined that Goodin’s mental retardation had decreased his ability to cope with his schizophrenia. She noted the following evidence against Goodin’s malingering: (1) his symptoms had been consistent since 1971; (2) he had nothing to gain by malingering in 1971, and he had never used his mental symptoms as an excuse for prior offenses; (3) he had harmed his credibility when he testified at his trial; and (4) he had continued to report auditory hallucinations when examined at Whitfield in 2004.
¶ 19. Dr. Denis Keyes met with Goodin in March 2010. Dr. Keyes has a doctorate in special education. Dr. Keyes compiled a report on Goodin, and he found that Goodin was mentally retarded. Dr. Keyes found that Goodin had clear deficits in the “adaptive skills” identified by the Ameri *1109 can Psychiatric Association (“APA”) and the American Association on Mental Retardation (“AAMR”), those being adaptive skills in the areas of communication, self-care, home living, social/interpersonal skills, use of community resources, self direction, health and safety, functional academics, work, and leisure.
¶ 20. An evidentiary hearing was held in the circuit court on May 17-19, 2010. Goodin called as witnesses Dr. Randall Thomas, who had evaluated him at Oakley in 1971; Dr. Billy Fox, who had supervised psychometrist Tommy Terrell when he tested Goodin in 1973; his brother, Parker Goodin; Robert Brooks, Goodin’s primary trial counsel; Dr. Tora Brawley, who had examined him in January 2010; Dr. Donna Schwartz-Watts, who also had examined Goodin in January 2010; and Dr. Gerald O’Brien, who had examined Goodin in 1999. The deposition of Dr. Denis Keyes was entered into evidence. The consensus of Goodin’s witnesses was that Goodin had subaverage intellectual functioning, that he had significant deficits in adaptive functioning, and that his deficits had manifested before the age of eighteen, which satisfied the requirements for mental retardation under Atkins. Their view was that he was mentally retarded as defined by this Court in Chase.
¶ 21. In addition to the medical testimony, Goodin’s brother, Parker, was called to testify. Parker was six years older than Goodin; he left home when Goodin was eleven or twelve, and he testified as to Goodin’s condition at that time. Parker testified that the Goodin family lived in poor conditions with regard to heat, electricity, and food. Their father hit Goodin many times, sometimes with a cane, but Parker never saw his father'hit his brother in the head. Parker testified that his brother did not have friends, did not play with other children, would swing a stick by himself for hours, did not ride a bicycle, and could not dress or bathe himself.
¶ 22. When Goodin rested, the State called Robert Brooks, Goodin’s primary trial counsel at his May 1999 capital-murder trial; Dr. Paul Deal, a psychologist who had examined Goodin at Whitfield in 2004; and Dr. Reb McMichael, a psychiatrist who also had participated in the 2004 evaluation at Whitfield. Dr. Deal affirmed his opinion that Goodin had been malingering during the 2004 evaluation. He felt that Goodin’s vocabulary usage, comprehension, and understanding indicated intelligence beyond his test results; and he denied that Goodin was parroting because his answers appeared spontaneous. Dr. Deal said that attempting to test a person who was incarcerated on death row for adaptive functioning should be only a last resort and the testing should be performed with significant caution. Dr. Deal testified that Goodin was given the Victoria Symptom Validity Test, the Test of Malingering Memory (TOMM), and the Miller Forensic Assessment of Symptoms Test, and that these tests showed that Goodin was not giving his best effort. Dr. Deal reaffirmed his opinion that Goodin was not mentally retarded, stating that he did not have significantly deficient intellectual functioning, and it was difficult to opine on significant limitations in adaptive functioning because of Goodin’s many years of incarceration.
¶ 23. On cross-examination, Dr. Deal agreed that he did not administer or score the tests during the 2004 evaluation. Dr. Deal agreed that, even if Goodin had been malingering, that did not mean he was not mentally retarded or schizophrenic. Dr. Deal testified that he had reviewed Goo-din’s prior tests and school records, though he did not think he had seen the 1971 test by Dr. Thomas at Oakley. Dr. Deal agreed that Goodin’s test scores had been somewhat consistent since the 1970s, al *1110 though he questioned the 1971 scores because of the difference in the verbal and performance IQ scores. Dr. Deal agreed that Goodin’s score on the TOMM did not strongly suggest malingered memory, but he said that score was considered in conjunction with other evidence. Dr. Deal agreed that the Whitfield examiners had attempted to employ a test that was not valid for testing adaptive functioning, considering Goodin’s age and years in prison, but he said they had been “desperate for information.”
¶ 24. Dr. McMiehael was a psychiatrist and Service Chief for Forensic Services at Whitfield. Dr. McMiehael identified malingering as faking symptoms that do not exist, or exaggerating symptoms that do exist, for secondary gain. Dr. McMiehael testified that this could have been present in some of Goodin’s previous examinations. Dr. McMiehael said that Goodin had traits consistent with antisocial personality disorder, though he did not render this diagnosis. Dr. McMiehael did not have enough information to say whether Goodin was schizophrenic. He also stated that Goodin appeared calm enough in court. Dr. McMiehael stated that he had never heard a person who was mentally retarded use words and language as Goodin had.
¶ 25. On October 8, 2010, the circuit court entered its Order Denying Motion for Post-Conviction Relief. As to the issue of mental retardation, the circuit court found that this Court’s decision in Chase v. State was controlling. The circuit court considered the testimony of Dr. Thomas, Terrell, Dr. O’Brien, Dr. Deal, Dr. McMi-chael, and Dr. Brawley on the prong of subaverage intellectual functioning. On the prong of deficits in adaptive functioning, the circuit court considered primarily the deposition of Dr. Keyes, which Goodin had submitted into evidence. Dr. Keyes found that Goodin possessed significant limitations in all areas of adaptive functioning, but the circuit court noted that Dr. Keyes did not take into consideration that Goodin had been incarcerated for most of his adult life. As to whether there was evidence of onset of these problems before age eighteen, the circuit court cited the testimony of Goodin’s brother, Goodin’s school records, and Dr. Thomas’s 1971 evaluation.
¶ 26. The circuit court then discussed the qualifications of Goodin’s experts under Chase. The State objected to several of Goodin’s expert’s opinions due to its perception of this Court’s requirements for experts under Chase. See Chase, 878 So.2d at 1029. The circuit court ultimately found that Goodin had failed to prove by a preponderance of the evidence that he was mentally retarded. The court concluded:
Despite scoring poorly on tests measuring intellectual functioning, Goodin’s cognitive abilities are beyond that of a person who is genuinely mentally retarded. Any deficits in adaptive functioning were certainly affected by the fact that Goodin has been incarcerated for most of his adult life. Therefore, Goodin has not proven by a preponderance of evidence that he is mentally retarded.
¶ 27. On the issue of ineffective assistance of counsel in the area of mental illness, the circuit court noted that Goo-din’s attorney, Robert Brooks, had filed a pretrial motion for psychiatric examination of Goodin, which was granted, and trial counsel relied on Dr. Guild’s psychiatric evaluation. The circuit court noted that trial counsel interviewed Shirley Nash, Goodin’s girlfriend at the time of Willis Rigdon’s murder, and Tommie Dennis, one of Goodin’s sisters, but did not find any other witnesses. Brooks explained to the court that, in his experience, a mental-illness defense asserting anything less *1111 than insanity was not well-accepted by juries. Acknowledging the limited time and resources, the circuit court found that trial counsel’s “representation fell within the objective standard of reasonableness, and therefore, was not ineffective.”
¶ 28. On the issue of ineffective assistance of counsel based on counsel’s performance in the determination of Goodin’s competency, the circuit court found that trial counsel had conducted a professionally reasonable investigation into Goodin’s competency. The court said counsel had requested a psychiatric examination of Goodin, an examination had been performed in which Goodin was found to be competent, and counsel had a right to rely on those findings.
DISCUSSION
¶29. Goodin appealed and raised the following issues: (1) the circuit court erred in finding that Goodin had failed to prove that he was mentally retarded; (2) the circuit court’s rulings in regard to the admission and exclusion of certain doctors’ opinions violated his constitutional rights and resulted in prejudice to Goodin; (3) he had received ineffective assistance of counsel on the issue of his mental illness, including counsel’s failure to investigate and failure to present evidence of mental illness during sentencing; and (4) he had received ineffective assistance of counsel on the issue of competency. Due to our discussion and disposition on issues one and four, we decline to address issues two and three.
¶ 30. This Court has provided the following standard of review for an evidentiary hearing conducted by a trial court in a post-conviction-relief case:
“When reviewing a lower court’s decision to deny a petition for post[-] conviction relief this Court will not disturb the trial court’s factual findings unless they are found to be clearly erroneous.” Brown v. State, 731 So.2d 595, 598 (Miss.1999) (citing Bank of Mississippi v. Southern Mem’l Park, Inc., 677 So.2d 186, 191 (Miss.1996)) (emphasis added). In making that determination, “[t]his Court must examine the entire record and accept ‘that evidence which supports or reasonably tends to support the findings of fact made below, together with all reasonable inferences which may be drawn therefrom and which favor the lower court’s finding of fact ....’” Mullins v. Ratcliff, 515 So.2d 1183, 1189 (Miss.1987) (quoting Cotton v. McConnell, 435 So.2d 683, 685 (Miss.1983)). That includes deference to the circuit judge as the “sole authority for determining credibility of the witnesses.” Mullins, 515 So.2d at 1189 (citing Hall v. State ex rel. Waller, 247 Miss. 896, 903,157 So.2d 781, 784 (1963)).
Doss v. State, 19 So.3d 690, 694 (Miss.2009) (quoting Loden v. State, 971 So.2d 548, 572-73 (Miss.2007)). Although the trial court’s findings of fact will not be disturbed unless found to be clearly erroneous, questions of law are reviewed de novo. Doss, 19 So.3d at 694 (quoting Brown, 731 So.2d at 598). “The burden of proof at an evidentiary hearing on a PCR case is on the petitioner to show ‘by a preponderance of the evidence’ that he is entitled to relief.” Doss, 19 So.3d at 694 (quoting Miss. Code Ann. § 99-39-23(7) (Rev.2007)).
I. Whether Goodin is mentally retarded according the standards set forth in Atkins v. Virginia and Chase v. State.
¶ 31. The Eighth Amendment to the United States Constitution says, “[ejxces-sive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted.” U.S. Const, amend. VIII (emphasis added). In 2002, *1112 the United States Supreme Court held that execution of a mentally retarded person constituted cruel and unusual punishment in violation of the Eighth Amendment. Atkins, 536 U.S. at 321, 122 S.Ct. 2242. This Court has recognized that “Atkins exempts all mentally retarded persons — even those who are minimally mentally retarded — from execution[.]” Doss, 19 So.3d at 709-10 (quoting Chase, 873 So.2d at 1026). Discussing Atkins, this Court explained:
The Atkins Court held the death penalty to be “excessive” as applied to mentally retarded inmates and found that the Constitution “places a substantive restriction on the State’s power to take the life” of a mentally retarded prisoner. Atkins, 536 U.S. at 321, 122 S.Ct. 2242, 153 L.Ed.2d 335. The Court found that there existed a national consensus which called into question “the relationship between mental retardation and the peno-logical purposes served by the death penalty.”
Gray v. State, 887 So.2d 158, 168 (Miss.2004).
¶ 32. The standards, definitions, and procedure for making a determination of mental retardation were provided by this Court in Chase v. State. A defendant must prove that he meets the standard for mental retardation by a preponderance of the evidence. Chase, 873 So.2d at 1028 (quoting Foster v. State, 848 So.2d 172, 175 (Miss.2003)). The circuit court, sitting without a jury, will consider and decide whether the defendant is mentally retarded. Id.
¶ 33. This Court in Chase adopted the clinical definition of mental retardation set forth by the Supreme Court in Atkins. “Mental retardation refers to substantial limitations in present functioning.” Chase, 873 So.2d at 1027 (quoting Atkins, 536 U.S. at 308 n. 3, 122 S.Ct. 2242). According to the AAMR, mental retardation is characterized by: (1) “significantly subav-erage intellectual functioning,” (2) “existing concurrently with related limitations in two or more of the following applicable adaptive skill areas: communication, self-care, community use, self-direction, health and safety, functional academics, leisure, and work,” (3) which “manifests before age 18.” Id. The definition of mental retardation from the APA is almost identical.[1] Id.
¶ 34. Persons with an IQ of 50-55 to 70 typically are described as having “mild mental retardation,” but “mental retardation may, under certain conditions, be present in an individual with an IQ of up to 75.” Chase, 873 So.2d at 1028 (quoting Atkins, 536 U.S. at 308 n. 3, 122 S.Ct. 2242). This Court has said that the Minnesota Multiphasic Personality Inventory-II (MMPI-II) should be administered, because “its associated validity scales make the test best suited to detect malingering.” Chase, 873 So.2d at 1028 (quoting Foster, 848 So.2d at 175). In addition to the MMPI-II, experts should use “any other tests and procedures permitted under the Mississippi Rules of Evidence, and deemed necessary to assist the *1113 expert and the trial court in forming an opinion as to whether the defendant is malingering.” Chase, 873 So.2d at 1028 n. 19. See also Lynch v. State, 951 So.2d 549, 557 (Miss.2007) (trial courts are free to use any approved test to determine mental retardation and/or malingering).
¶ 35. Goodin argues that he meets all the requirements of Atkins as applied by this Court in Chase. He claims that he has proven, by a preponderance of the evidence — through expert testimony, lay testimony, and prior records — that he has subaverage intellectual functioning, significant deficits in adaptive functioning, and that his deficits manifested before age eighteen. As to subaverage intellectual functioning, Goodin points to five tests between 1971 and 2010, all using some version of the WAIS, and all with resulting full-scale IQ scores in the sixties or lower. Goodin argues that his use of language is not an adequate basis for discounting the results of these tests over forty years. Goodin relies on Dr. Keyes and Dr. O’Brien to argue that he has deficits in all of the adaptive skill areas. Finally, to support that his deficits manifested before he was eighteen, Goodin relies on school records, testimony from family, and the 1971 Oakley evaluation, which was performed when he was sixteen.
¶ 36. The State argues that the credibility of all of Goodin’s experts can be questioned on some basis. For instance, Dr. Thomas did not test Goodin for malingering and did not assess adaptive functioning in 1971; Dr. Fox did not attend the 1973 test, where no test was given for malingering or adaptive functioning; Dr. Brawley did not assess mental retardation; Dr. O’Brien changed his opinion since 1999; Dr. Keyes’s doctorate was in special education, and his opinion allegedly was biased based on prior court decisions. The State argues that its witnesses were credible, and the circuit court was entitled to rely on their opinions.
¶ 37. After careful examination of the entire record, we find that the circuit court’s ultimate determination that Goodin is not retarded is clearly erroneous. The evidence that Goodin has met this Court’s standard for mental retardation is overwhelming and may not be discounted by the assertion that he is too adept at using language or by other unsupported allegations of malingering. This Court is mindful of the appropriate standard of review and deference to be given to the circuit court’s findings. We find that this is a rare case that merits reversal, because the evidence is so convincing, barely controverted, and covers such a span of time.
¶ 38. We understand the concerns surrounding the assessment of Goodin’s adaptive functioning due to his being incarcerated for most of his adult life. This Court has recognized that “there is considerable, sincere disagreement among professionals and scholars in the field as to the best method for measuring adaptive functioning.” Doss, 19 So.3d at 714. This is especially true with regard to the inherent difficulties of assessing adaptive functioning for someone who has been incarcerated for most of his adult life. Id.[2]
*1114 ¶ 39. We have held that courts and experts are free to use any approved test to determine mental retardation, including adaptive functioning. Id. at 712-13 (quoting Lynch, 951 So.2d at 556-57). However, because the definitions of mental retardation require onset before age eighteen, when evaluating anyone over the age of eighteen — incarcerated or not — some type of retrospective analysis must be employed. See Thorson v. State, 76 So.3d 667, 672 n. 8 (Miss.2011) (“The onset of mental retardation for Atkins has to be before the defendant is older than eighteen years of age. Accordingly, Dr. Swanson had to apply her Vineland tests retrospectively on Thorson, now a middle-aged man.”).[3] We adopt the reasoning of a Louisiana federal district court, which endorsed the use of retrospective analysis in Atkins hearings:
Unlike in a medical, educational, or social services context, the law is concerned with what was rather than what is. The point of an Atkins hearing is to determine whether a person was mentally retarded at the time of the crime and therefore ineligible for the death penalty, not whether a person is currently mentally retarded and therefore in need of special services. Because of this, the diagnosis of mental retardation in the Atkins context will always be complicated by the problems associated with retrospective diagnosis.
These problems are only compounded by the fact that both the APA and AAMR define mental retardation as a developmental disability and limit the diagnosis to those persons who exhibited the required characteristics prior to age 18. As those under the age of 18 are already constitutionally ineligible for the death penalty, Roper v. Simmons, 543 U.S. 551, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005), no clinician evaluating a person for purposes of an Atkins hearing will *1115 ever be evaluating the person prior to age 18. Mental retardation in the Atkins context must therefore be diagnosed, if it is to be diagnosed at all, retrospectively in every sense of the word.
United States v. Hardy, 762 F.Supp.2d 849, 881-82 (E.D.La.2010). This Court has noted the importance of interviewing family and friends knowledgeable about the defendant’s past. See Doss, 19 So.3d at 714.[4] Interviews with educators or others in the community familiar with the defendant’s behavior before age eighteen also would provide valuable information. Adaptive-functioning tests may be administered to these individuals as well. A retrospective evaluation also could include a thorough review of school records, social history, and work history, among other things.[5] Considering Dr. Keyes’s assessment of Goodin’s adaptive functioning in conjunction with Goodin’s history, school records, testimony from family members, and the 1971 evaluation, we find that Dr. Keyes’s assessment that Goodin had deficits in adaptive functioning was valid.
¶ 40. According to the dissent’s reasoning, adaptive-functioning testing performed on an incarcerated person would never be valid; therefore, a finding of mental retardation would never be possible for someone who has been incarcerated for any length of time. Considering all of the evidence before this Court, we cannot find that Goodin is not mentally retarded simply because he has been incarcerated for nearly his entire adult life. The United States Supreme Court has held that the execution of a mentally retarded person constitutes cruel and unusual punishment, which is prohibited by the Eighth Amendment. Atkins, 536 U.S. at 321, 122 S.Ct. 2242. We have held that “Atkins exempts all mentally retarded persons — even those who are minimally mentally retarded— from execution!.]” Doss, 19 So.3d at 709-10 (quoting Chase, 873 So.2d at 1026). We will not deny an individual his constitutional rights simply because the testing environment is not ideal. We find the trial court’s conclusion that Goodin is not mentally retarded to be clearly erroneous. Taken together, the evidence in this case indicates that Goodin is mentally retarded.
*1116 ¶ 41. This Court finds that the evidence presented by Goodin establishes, by a preponderance of the evidence, that he is mentally retarded as contemplated by Atkins v. Virginia and Chase v. State. We therefore reverse the circuit court’s finding on mental retardation and render judgment in favor of Howard Goodin. The case is remanded for resentencing consistent with our finding.
II. Whether the trial court correctly applied Chase v. State to expert testimony at the evidentiary hearing.
¶ 42. Although this was not a separate issue presented by Goodin, we find that we should clarify how proof may be presented at a hearing on mental retardation in a capital post-conviction case. The State objected to the following: the testimony of Dr. Thomas because he was not licensed when he examined Goodin in 1971; the admission of the deposition of Dr. Keyes because he was not a licensed psychologist; and the opinion of Dr. Schwartz-Watts on mental retardation because she was not qualified as an expert in the administration and interpretation of tests. The circuit court elaborated on these and other objections in its Order Denying the Motion for Post-Conviction Relief as follows:
The Court reads Chase as holding that the petitioner must produce a licensed psychologist or psychiatrist, qualified as an expert in the field of assessing mental retardation, and further qualified as an expert in the administration and interpretation of tests, and in the evaluation of persons, for purposes of determining mental retardation, before petitioner may proceed with other opinions on mental retardation. At the time the above mentioned experts testified, Petitioner had not produced a qualified expert under Chase, and therefore, these experts could not testify to an opinion on mental retardation.
¶43. In reaching this conclusion, the circuit court applied its interpretation of Chase v. State. In Chase, this Court set out the following procedure to be applied when an evidentiary hearing on the issue of mental retardation has been requested:
We hold that no defendant may be adjudged mentally retarded for purposes of the Eighth Amendment, unless such defendant produces, at a minimum, an expert who expresses an opinion, to a reasonable degree of certainty, that:
1. The defendant is mentally retarded, as that term is defined by the American Association on Mental Retardation and/or The American Psychiatric Association;
2. The defendant has completed the Minnesota Multiphasic Personality Inventory-II (MMPI-II) and/or other similar tests, and the defendant is not malingering.
Such expert must be a licensed psychologist or psychiatrist, qualified as an expert in the field of assessing mental retardation, and further qualified as an expert in the administration and interpretation of tests, and in the evaluation of persons, for purposes of determining mental retardation.
Upon meeting this initial requirement to go forward, the defendant may present such other opinions and evidence as the trial court may allow pursuant to the Mississippi Rules of Evidence.
Thereafter, the State may offer evidence, and the matter should proceed as other evidentiary hearings on motions.
Chase, 873 So.2d at 1029. We find that the circuit court erred in determining that Goodin was required to call or produce his witnesses in any certain order at the hearing, such that an expert as described by the circuit court would have to be called *1117 first before other opinions and evidence on mental retardation could be presented. We find that Chase requires, as a threshold, to obtain an evidentiary hearing, the production of such an expert as described above and the expert’s corresponding opinion. Once that threshold has been met, evidence and testimony may be presented at the hearing consistent with the Mississippi Rules of Evidence and the United States and Mississippi Constitutions.
III. Whether Goodin received ineffective assistance of counsel on the issue of competency.
 ¶ 44. Goodin has asserted an in-effeetive-assistance-of-counsel claim regarding his counsel’s performance on the issue of competency. We have ruled on mental retardation, which goes to sentencing, but this issue must be addressed, because competency relates to the conviction phase. Goodin claims that trial counsel was ineffective because he failed to investigate and litigate the matter of his competency. In Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), the United States Supreme Court established the standard for assessing an ineffective-assistance-of-counsel claim. The test is “whether counsel’s conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result.” Havard v. State, 988 So.2d 322, 328 (Miss.2008) (quoting Strickland, 466 U.S. at 686,104 S.Ct. 2052). To prevail on an ineffective-assistance-of-counsel claim, the defendant must prove that (1) his counsel’s performance was deficient, and (2) the deficient performance prejudiced the defense of his case. Havard, 988 So.2d at 328 (quoting Strickland, 466 U.S. at 687, 104 S.Ct. 2052). If the defendant cannot prove both deficient performance and prejudice to his case, the Court will not find that the conviction was unreliable.
A. Whether counsel’s performance was deficient.
¶ 45. To satisfy the first prong of the Strickland test, the defendant must prove that “counsel’s performance fell below an objective standard of reasonableness.” Wilson v. State, 81 So.3d 1067, 1074 (Miss.2012) (citing Strickland, 466 U.S. at 687, 104 S.Ct. 2052). “Judicial scrutiny of counsel’s performance must be highly deferential.” Wilson, 81 So.3d at 1075 (quoting Strickland, 466 U.S. at 689, 104 S.Ct. 2052). Defense counsel is presumed competent. Havard, 988 So.2d at 329. This Court has said the following regarding the duty of counsel:
While courts must defer to lawyers’ judgments and strategies, “at a minimum, counsel has a duty to interview potential witnesses and to make independent investigation of the facts and circumstances of the case.” Ferguson v. State, 507 So.2d 94, 96 (Miss.1987). Under this standard, counsel may be deemed ineffective for relying almost exclusively on material furnished by the State during discovery and conducting no independent investigation. Id. While counsel is not required to exhaust every conceivable avenue of investigation, he or she must at least conduct sufficient investigation to make an informed evaluation about potential defenses. State v. Tokman, 564 So.2d 1339, 1343 (Miss.1990). Under Strickland, counsel has a duty “to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.” Strickland, 466 U.S. at 691, 104 S.Ct. 2052[.]
Wilson, 81 So.3d at 1075 (quoting Ross v. State, 954 So.2d 968, 1005 (Miss.2007)).
¶ 46. Robert Brooks was Goo-din’s primary trial counsel at his capital-murder trial in May 1999. Prior to de *1118 fending Goodin, Brooks had defended five capital-murder defendants in six trials. Brooks testified at the evidentiary hearing on Goodin’s motion for post-conviction relief, which included Goodin’s claim of ineffective assistance of counsel. Brooks testified that he did not have much of a strategy at the guilt phase besides hoping something would go wrong in the State’s case. He said that he did not have an investigator, but he could not remember whether he had filed a motion for an investigator before trial. The only mental-health records Brooks obtained were the reports from the court-appointed psychologist and psychiatrist and one document from MDOC on Goodin’s mental condition. Brooks contacted a doctor at Parchman concerning Goodin’s mental condition and was told that the doctor would not testify that Goodin was insane. Brooks testified that he was able to communicate with Goodin a little, but he got his primary information from Goodin’s sister and girlfriend. Brooks said he received no information from Goodin or his sister that would have indicated Goodin had been found to be schizophrenic. However, he thought Goodin’s refusal to cooperate might be a possible result of an unsound mind. He filed a motion for psychiatric examination before the trial because that was his “standard procedure in all capital cases.”
¶ 47. The circuit court granted Brooks’s motion for a psychiatric examination and ordered Goodin to be examined by Dr. O’Brien, a psychologist, and Dr. Guild, a psychiatrist. The order instructed the doctors to determine whether Goodin had the “present ability to stand trial and assist his attorneys in his defense” and whether he had the “ability to know the difference between right and wrong and to understand the nature and quality of his actions at the time of the alleged offenses.” Dr. O’Brien saw Goodin twice, and Dr. Guild saw Goodin once. Both doctors found that Goodin was competent to stand trial; Brooks relied on that and saw no reason to request a competency hearing. The reports made by Drs. O’Brien and Guild were not made a part of the record in Goodin’s direct appeal. Brooks testified that he did not feel that Dr. O’Brien’s report would have been helpful, because Dr. O’Brien indicated that Goodin was malingering. The circuit court did not make any findings on the record or enter any orders as to Goodin’s mental state.
¶ 48. Uniform Circuit Court Rule 9.06 pertains to competency and provides that, if the court or counsel “has reasonable ground to believe that the defendant is incompetent to stand trial, the court shall order the defendant to submit to a mental examination by some competent psychiatrist selected by the court[.]” Brooks requested a psychiatric evaluation, and the court granted that request. Rule 9.06 goes on to say that, after such examination, a competency hearing should be conducted:
After the examination the court shall conduct a hearing to determine if the defendant is competent to stand trial. After hearing all the evidence, the court shall weigh the evidence and make a determination of whether the defendant is competent to stand trial. If the court finds that the defendant is competent to stand trial, then the court shall make the finding a matter of record and the case will then proceed to trial. If the court finds that the defendant is incompetent to stand trial, then the court shall commit the defendant to the Mississippi State Hospital or other appropriate mental health facility....
URCCC 9.06. In this case, after the mental examination, counsel determined that competency was not an issue, because both doctors had opined that Goodin was com *1119 petent. In Sanders v. State, 9 So.3d 1132 (Miss.2009), a plurality of this Court found that Uniform Rule 9.06 must be enforced strictly according to its plain language. “[W]hen the evidence raises a sufficient doubt as to a defendant’s mental ability to stand trial, that defendant is deprived of due process of law when the trial court does not, on its own, conduct a separate competency hearing.” Sanders, 9 So.3d at 1135. In light of Goodin’s vast history, set forth in Section I supra, sufficient evidence certainly existed to raise doubts as to Goodin’s mental condition and his ability to stand trial. After the mental evaluation was requested and ordered, counsel should have requested a competency hearing.
¶49. Goodin argues that trial counsel was ineffective for failure to investigate properly and to litigate the matter of Goo-din’s competency and how it might have been affected by Goodin’s mental illness. He claims that trial counsel should have done a better job of sharing information with Drs. Guild and O’Brien and should have sought to have him retested. Goodin states that counsel could have found his earlier medical records from Laird Hospital, Weems Health Center, and the Social Security Administration. We agree.
¶ 50. Brooks did not have an investigator; he relied primarily on evidence produced by the State; he failed to obtain prior medical records that contained evidence of an extensive background suggestive of mental illness; and he interviewed very few witnesses. No psychological evidence was produced in the guilt phase of this case. Brooks actually testified that he did not have a strategy at the conviction phase other than hoping something would go wrong with the State’s case. Brooks’s performance was deficient under Strickland and the standards established by this Court. See Wilson, 81 So.3d at 1075; Ross, 954 So.2d at 1005. Considering all of the evidence in this case and the failure to follow the procedure in Rule 9.06, we find that trial counsel’s performance was deficient on the issue of competency at the conviction phase.
B. Whether counsel’s deficient performance resulted in prejudice to Goodin.
¶ 51. Because we have found that counsel’s performance was deficient, we move to the second prong of the Strickland test, whether counsel’s deficient performance resulted in prejudice to the defendant. Said another way, the test is “whether there is ‘a reasonable probability that, but for counsel’s unprofessional errors, the result of the proceedings would have been different.’ ” Havard, 988 So.2d at 329 (quoting Mohr v. State; 584 So.2d 426, 430 (Miss.1991)). Goodin’s sentence has been reversed and remanded, therefore we are considering only whether his conviction should be upheld, or whether it should be reversed due to prejudice resulting from counsel’s deficient performance.
¶ 52. Goodin claims that he was prejudiced because an adequate investigation by counsel would have revealed “a lifetime of mitigation evidence.” Goodin’s argument focuses on mitigating evidence as it relates to sentencing; Goodin did not provide any evidence of prejudice as to the conviction phase. Further, the evidence indicates that Goodin was competent to stand trial. Dr. Schwartz-Watts testified that Goodin’s competence at the time of trial was impacted by schizophrenia and cognitive disorder, but she said those conditions did not impact his ability to perceive and understand the nature of the proceedings, and she would not say that Goodin was incompetent at the time of his trial. Dr. Guild, Dr. O’Brien, and the Whitfield doctors all found that Goodin was not mentally ill or incompetent. Finally, Goodin has never been found incompetent to stand trial or to *1120 enter a plea, although he had been involved in multiple criminal prosecutions.
¶ 58. Although we have found that the evidence supports a finding that Goodin is mentally retarded, that finding does not equate to a finding of incompetency. Atkins, 536 U.S. at 818, 122 S.Ct. 2242 (“Mentally retarded persons frequently know the difference between right and wrong and are competent to stand trial.”).[6] Goodin failed to present any evidence that he suffered prejudice as a result of counsel’s failures on the issue of competency. We find that Goodin has not shown a reasonable probability that counsel’s deficient performance on this issue was such that it resulted in prejudice and undermined confidence in the circuit court’s outcome. Goodin has failed to satisfy the second prong of the Strickland test, and his claim for ineffective assistance of counsel on the issue of competency fails.
CONCLUSION
¶ 54. We find the trial court’s conclusion that Goodin is not mentally retarded to be clearly erroneous. Instead, we find that the evidence presented by Goodin establishes, by a preponderance of the evidence, that he is mentally retarded as contemplated by Atkins v. Virginia. In light of this finding, we decline to address Goodin’s claim of ineffective assistance of counsel on the issue of mental illness. We find Goodin’s claim of ineffective assistance of counsel regarding competency at the conviction stage to be without merit. In light of our findings on these issues, we decline to address the remaining issues raised by Goodin. The judgment of the Newton County Circuit Court is affirmed in part and reversed and rendered in part; the circuit court’s sentence of death is vacated and this case is remanded to the Circuit Court of Newton County for resen-tencing consistent with this opinion on the charge of capital murder.
¶ 55. AFFIRMED IN PART; REVERSED AND RENDERED IN PART; VACATED IN PART AND REMANDED.
WALLER, C.J., DICKINSON, P.J., LAMAR, KITCHENS AND KING, JJ., CONCUR. CHANDLER, J„ CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION JOINED BY RANDOLPH AND PIERCE, JJ.

. The APA's definition of mental retardation comes from the Diagnostic and Statistical Manual of Mental Disorders: "The essential feature of Mental Retardation is significantly subaverage general intellectual functioning (Criterion A) that is accompanied by significant limitations in adaptive functioning in at least two of the following skill areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety (Criterion B). The onset must occur before age 18 years (Criterion C)." Chase, 873 So.2d at 1028 (quoting Atkins, 536 U.S. at 308 n. 3, 122 S.Ct. 2242) (quoting Diagnostic and Statistical Manual of Mental Disorders 39 (4th ed.2000))).

. In Doss v. State, we cited the following in regard to assessing an inmate's adaptive functioning:
[Tjesting instruments for assessing adaptive-functioning impairments can, for a variety of reasons, "be less than ideal for assessing adult criminal defendants who might be mentally retarded." [Dora W.] Klein, [Categorical Exclusions from Capital Punishment: How Many Wrongs Make a Right?,] 72 Brooklyn L.Rev. [1211,] 1235 [ (2007) ] (citing certain problems such as the unavailability of caregivers or other reliable independent sources, the use of inappropriate norms, and the atypical environment of a prison); [Linda] Rnauss & *1114 [Joshua] Kutinsky, [Into the Briar Patch: Ethical Dilemmas Facing Psychologists Following Atkins v. Virginia ], 11 Widener L.Rev. [121,] 131 [(2004)] ("Few (if any) measures of adaptive functioning have been designed or normed for use with a correctional population. Thus, adaptive functioning prior to incarceration should be the target for assessment.”); Note, Implementing Atkins, 116 Harv. L.Rev. [2565,] 2576 [(2003)] (noting that an individual’s environment may add a layer of uncertainty to diagnosing adaptive-skill deficits).
Doss, 19 So.3d at 714. See also Thorson v. State, 76 So.3d 667, 672 n. 8 (Miss.2011) ("Experts for each side agreed that being on death row for twenty years could have had an effect, either positively or negatively, on ... adaptive functioning.”).

. See also John Matthew Fabian, P.D., J.D., A.B.P.P., et. al., Life, Death, and IQ: It’s Much More Than Just a Score: Understanding and Utilizing Forensic Psychological and Neuropsychological Evaluations in Atkins Intellectual Disability/Mental Retardation Cases, 59 Clev. St. L.Rev. 399, 422-24 (2011):
While the AAIDD [formerly AAMR] provides no standardized methods for a retrospective evaluation of a defendant’s prior adaptive behaviors, it does endorse the practice when supported with clinical judgment. ... [I]t is the stance of the authors of this article that retrospective interviews with family members and other collateral informants ... [are] critical, as [they] provide[] information necessary to the defendant’s historical adaptive functioning.... While it is necessary to compare the adaptive functioning test results with normative data pertaining to individuals within the population at large (non-intellectually disabled people), some argue that prison is an artificial environment and adaptive tests should not be administered to collateral informants when a defendant has been incarcerated for lengthy periods. It is the first author’s recommendation that the expert should utilize the adaptive functioning instruments in a retrospective fashion with collateral informants who rate the defendant’s adaptive behaviors prior to incarceration.

. In Doss, we affirmed the trial court’s denial of Doss's post-conviction relief Atkins claim, affirming that "Doss had failed to prove by a preponderance of evidence that he [was] mentally retarded.” Doss, 19 So.3d at 714-15. In reaching that conclusion, we noted the need for interviews with family and friends knowledgeable about the defendant's past behavior.
... Although Dr. Grant tested Doss for impairments in adaptive-skill behaviors, he spoke to no family members or other persons besides Doss. Interviews with family members, and others familiar with an individual’s typical behavior over an extended period of time in various settings, can supplement or aid in the interpretation of test results. Peggy M. Tobolowsky, Atkins Aftermath: Identifying Mentally Retarded Offenders and Excluding Them From Execution, 30 J. Legis. 77, 98 (2003) (using different sources of data is recommended rather than placing sole reliance on the adaptive-skill assessment instrument); Linda Knauss & Joshua Kutinsky, Into the Briar Patch: Ethical Dilemmas Facing Psychologists Following Atkins v. Virginia, 11 Widener L.Rev. 121, 130-31 (2004).
Doss, 19 So.3d at 714.-

. We do not attempt to establish a checklist of items to be considered in a retrospective evaluation, we only mention some items that previously have been recognized. See Hardy, 762 F.Supp.2d at 882; Doss, 19 So.3d at 714. See also Fabian, et. al., 59 Clev. St. L.Rev. at 423-24; Tobolowsky, 30 J. Legis. at 98 (citing AAMR, Mental Retardation: Definition, Classification, and Systems of Supports 74-75, 85-87 (10th ed.2002); APA, Diagnostic & Statistical Manual of Mental Disorders 42 (4th ed.2000)).

. See also Kirksey v. Warden, Ely State Prison, 281 P.3d 1192, *7 (Nev.2009) (court found that mental retardation was not equivalent to incompetency; “the test for determining competency is ‘whether [the defendant] has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding — and whether he has a rational as well as factual understanding of the proceedings against him.' ” Melchor-Gloria v. State, 99 Nev. 174, 180, 660 P.2d 109, 113 (1983) (quoting Dusky v. United States, 362 U.S. 402, 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960) (alteration in original))).