KITCHENS, Justice,
dissenting:
¶ 58. After Sherwood Brown received a death sentence for capital murder, this Court granted him an evidentiary hearing to determine whether .he is intellectually disabled[14] and, therefore, exempt from execution. In denying Brown- relief, the circuit court applied the wrong legal standard. Now the majority perpetuates that error. Upon review of the evidence presented to the trial court, and applying the correct legal standard, I would find that Brown is intellectually disabled and ineligible for execution.
I. The circuit court applied an incorrect legal standard.
¶ 59. Brown argues that the circuit judge applied an incorrect legal standard for three reasons and that his factual findings should be given no deference. Specifically, he argues that the trial judge “turned the requirement that the onset of mental retardation be before age eighteen into an evidentiary requirement that only evidence from contacts before age eighteen may be used to prove adaptive functioning deficits.... ” This concern about the trial court’s application of the Chase[15] standard embodies two distinct disputes between the parties.
¶ 60. First, the parties dispute whether the Chase standard requires the petitioner to present evidence that each adaptive functioning deficit manifested prior to age eighteen, or whether the petitioner need only provide evidence that the intellectual disability manifested in some way prior to the age of eighteen years. Second, the parties dispute whether the trial judge actually disregarded the results of Dr. Marc Zimmermann’s Vineland adaptive functioning test because it was administered to Angela Brown, who did not know Brown prior to his attainment of the age of eighteen.
*902 ¶ 61. The Vineland measures adaptive functioning in various aspects of life. Dr. Zimmermann administered the test to Angela because, according to a phenomenon called the Cloak of Competency, individuals tend to overestimate their own skills. Because a diagnosis of intellectual disability requires onset prior to age eighteen, the tested person should have known the subject person prior to his attainment of that age. Though Angela did not know Brown at that age, Dr. Zimmermann explained that he had asked Angela to answer the questions by thinking back as close to age eighteen as she had known Brown. Dr. Zimmermann opined that the Vineland results indicated that Brown had an adaptive functioning deficit in the area of communication.
¶ 62. The trial court provided an in-depth analysis of the adaptive functioning areas. As he considered each area, the trial judge detailed the evidence supporting or refuting an adaptive functioning deficit in the particular area. But, before he engaged in that area-by-area analysis, the trial judge articulated some general principles about adaptive functioning deficits. There, he noted that Dr. Zimmermann had administered the Vineland test to Angela and stated “[h]e later admitted the test was recommended for someone who knew the person being evaluated before the age of 18, but that she only knew Brown after he was eighteen.” The trial judge’s order also noted the lack of “psychological testing before Brown was 18.”
¶ 63. The circuit judge appears not to have taken into account Dr. Zimmer-mann’s Vineland test results, because Dr. Zimmermann had relied on information from times after Brown had become eighteen years of age. No other reading of the order is tenable in light of the trial judge’s detailed analysis of the evidence he considered without a single mention of the Vine-land. The majority disagrees, finding that “the judge mentioned Angela’s testimony about Brown.” But, while the judge mentioned Angela’s qualitative testimony, his detailed review of the evidence omitted any reference to the quantitative results produced by the Vineland. To disregard this evidence was legal error.
¶ 64. This Court adopted its Chase standard directly from two pieces of medical literature on intellectual disability. Each medical definition requires onset or manifestation prior to age eighteen. Chase v. State, 873 So.2d 1013, 1027-28 (Miss.2004) (quoting Atkins v. Virginia, 536 U.S. 304, 308 n. 3, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002) (quoting Mental Retardation: Definition, Classification, and Systems of Support 5 (9th ed.1992); Diagnostic and Statistical Manual of Mental Disorders 39 (4th ed.2000))). In Goodin v. State, we noted that an expert may utilize any accepted test of adaptive functioning deficits, but that a retrospective analysis is necessary to show onset prior to age eighteen. Goodin v. State, 102 So.3d 1102, 1104 (Miss.2012) (internal citations omitted). We stated:
This Court has noted the importance of interviewing family and friends knowledgeable about the defendant’s past. Interviews with educators or others in the community familiar with the defendant’s behavior before age eighteen also would provide valuable information. Adaptive-functioning tests may be administered to these individuals as well. A retrospective evaluation also could include a thorough review of school records, social history, and work history, among other things.
Id. at 1115 (internal citations omitted). Goodin adopted that standard from the opinion of the United States District Court for the Eastern District of Louisiana in United States v. Hardy. Id. at 1114 (quoting United States v. Hardy, 762 F.Supp.2d 849, 881-82 (E.D.La.2010)). In Hardy, the *903 district court likewise required retrospective analysis, but stated:
Certainly a person’s level of adaptive functioning in the present might provide some information about his abilities during the developmental period as, all things being equal, a person without limitations in the present is less likely to have had limitations before, and a person with limitations today is more likely to have had them during the developmental period.
Hardy, 762 F.Supp.2d at 881 (citing American Association on Intellectual and Developmental Disabilities, 95-96 (11th ed.2010) (relegating contemporary assessment to a possible additional tool); Id. at 46 (noting retrospective diagnosis requires evaluation of subject’s “previous functioning”)). So the onset requirement necessitates a retrospective analysis to before age eighteen. However, evidence from after age eighteen still carries probative value. The trial judge converted the requirement that some evidence show manifestation before age eighteen into a requirement that the petitioner utilize only evidence from events and circumstances before age eighteen. By so doing, he applied the wrong legal standard and his factual findings are entitled to no deference.' Neal v. State, 687 So.2d 1180, 1187 (Miss.1996). And this error infects the circuit judge’s consideration of criteria B and C because the quantitative evidence produced by the Vineland was relevant to establish adaptive functioning deficits and manifestation prior to age eighteen.
¶ 65. Because the trial judge failed to apply the correct legal standard, I would review his factual findings de novo. Id.
II. The circuit court’s ruling ignores the overwhelming weight of the evidence.
¶ 66. Brown bore the burden of proving by a preponderance of the evidence that he had “(1) subaverage intellectual functioning (2) accompanied by significant limitations in at least two adaptive skills (3) that manifest before age eighteen.” Goodin, 102 So.3d at 1104 (citing Atkins, 536 U.S. at 318, 122 S.Ct. 2242; Chase, 873 So.2d at 1027-28). He also had to show that he was not malingering. Chase, 873 So.2d at 1029. Reviewing the evidence de novo, I would find that Brown met his burden.
¶ 67. The State conceded the subaver-age intellectual functioning — both experts agreed Brown had a seventy-five IQ — and malingering elements during the evidentia-ry hearing. So the only question before this Court is whether Brown established two or more adaptive functioning deficits, and that they manifested prior to age eighteen, by a preponderance of the evidence.

Functional Academics

¶ 68. June Gilbreath taught Brown in sixth grade and was "tasked with filling out his academic transcript that year. She testified about her experience with Brown as a student and explained the information contained in his transcript. Much of her testimony centered on a handwritten “LD” notation on Brown’s transcript, which Gil-breath said that she wrote. She testified that the notation indicated that Brown was “learning disabled” or had a “learning disability.”
¶ 69. The trial judge found that the State refuted this evidence with the testimony of Susan Kizer. She reviewed Brown’s transcript and testified that “SLD” is the correct way to denote a learning disability. She also stated that “LD” was not a customary way to acknowledge that a student was learning disabled. Additionally, she explained that a student would not be labeled learning disabled except upon completion of a compre *904 hensive evaluation. But she testified that a transcript may or may not indicate whether a student was enrolled in special education and that school records from the time Brown attended have been destroyed. She also admitted that she had no personal knowledge about Brown.
¶ 70. In the past, we have noted the importance of the fact that the petitioner’s evidence was “barely controverted” by the State’s evidence when reversing a trial judge’s finding that the petitioner is not intellectually disabled. Goodin, 102 So.3d at 1113. Susan Kizer’s testimony does not refute Gilbreath’s testimony that Brown had been identified as learning disabled. Though she testified that “SLD” is the appropriate notation, she did not testify that no teacher ever would use “LD.” She admitted that she lacked personal knowledge about Brown. And the fact that a learning disability needed to be determined through a comprehensive evaluation is of no consequence because she could not testify to any personal knowledge that Brown never had such an evaluation and could not produce any record to support such a conclusion. Kizer’s testimony, at most, reflects an opinion that Gilbreath used an incorrect notation on Brown’s transcript.
¶ 71. Gilbreath also explained that Brown struggled academically in the first through fifth grades, but that his grades improved because they were “modified,” meaning Brown was given easier material and tests than other students received. Gilbreath explained that this practice continued in the eighth grade, where Brown also received higher grades. She also testified that Brown repeated the first grade, received “social promotions” because of his size in the fourth and fifth grades despite failing grades, and spent a year and a half in the seventh grade before being promoted to the second semester of the eighth grade.
¶ 72. The State’s expert, Dr. Storer, noted that the fact that Brown failed the first grade was of particular concern because failing early grades indicates more severe problems. He opined that an adaptive functioning deficit in functional academics was belied by the fact that Brown passed numerous grades. But Dr. Storer’s opinion failed to account for Gil-breath’s undisputed testimony that Brown’s grades were modified and that he received multiple social promotions.
¶ 73. Dr. Storer also cited Brown’s standardized test scores, which advanced from year to year. Gilbreath explained those scores. She noted that in the fifth grade, Brown had achieved only a second-grade reading level and a third-grade math level. In sixth grade, he had a third-grade reading level and a fourth-grade math level. She explained that Brown struggled despite giving his best effort in school. Finally, Dr. Zimmermann opined, based on this information, that Brown had a significant adaptive functioning deficit in the area of functional academics. He explained that it is common for schools to label a child learning disabled rather than to assess for intellectual disability.
¶ 74. The overwhelming, barely controverted evidence shows that Brown struggled significantly in school and that his successes were the result of decreasing standards and social promotions. That is to say, even when Brown advanced, he did not do so based on his ability. The State failed to refute this evidence in any substantial way. Goodin, 102 So.3d at 1113. Finally, Brown’s expert opined that he possessed an adaptive functioning deficit in this area. Applying a de novo review, I would find that Brown established an adaptive functioning deficit by a preponderance of the evidence.
*905 ¶ 75. Further, because all of the evidence of this deficit relates to a time before Brown turned eighteen, Dr. Zim-mermann opined that this established manifestation prior to age eighteen. That conclusion is not contradicted by the evidence. So the manifestation element is satisfied with respect to this deficit.

Communication

¶ 76. Dr. Zimmermann opined that Brown has a significant adaptive functioning deficit in the area of communication. Dr. Zimmermann based that conclusion on the Vineland test, which the trial judge failed to consider. That test revealed that Brown’s age equivalence for receptive speech was three years, seven months; expressive speech, seven years, six months; written communication, ten years, zero months. And Gilbreath noted that, in the fifth grade, Brown had a second-grade reading level and in sixth grade, a third-grade reading level based on standardized test scores.
¶ 77. Likewise, Dr. Storer administered the Wide Range Achievement Test (WRAT) and concluded that Brown currently possesses a word-reading ability just below a ninth-grade level and a sentence comprehension ability at the seventh-grade level. And the only evidence to refute Brown’s deficit in this area was that Dr. Storer noted that Brown’s ability to care for his children and take them to the doctor suggested, but did not establish, that Brown possessed good communication skills. This left Brown’s evidence “barely controverted.” Id.
¶ 78. I also would find that Brown proved an adaptive functioning deficit in communication by a preponderance of the evidence. The State simply failed to refute Dr. Zimmermann’s findings in this area. And, like functional academics, this deficit manifested prior to age eighteen as evidenced by the standardized test scores in Brown’s academic transcript and June Gilbreath’s testimony.
¶ 79. Because the State conceded the subaverage intellectual functioning and malingering elements, and because Brown proved adaptive functioning deficits in functional academic skills and communication which manifested prior to age eighteen by a preponderance of the evidence, I would find that he is intellectually disabled under our Chase standard.
DICKINSON, P.J., AND KING, J., JOIN THIS OPINION.

. Intellectually disabled has replaced the term mentally retarded in the professional vernacular. The United States Supreme Court has recognized this change. Hall v. Florida, - U.S. -, 134 S.Ct. 1986, 1990, 188 L.Ed.2d 1007 (2014).

. Chase v. State, 873 So.2d 1013 (Miss.2004).