DICKINSON, Presiding Justice,
dissenting:
¶ 79. I dissent for two reasons. First, under our current Atkins law and procedure, the circuit judge failed to follow this Court’s precedent, applied a flawed Atkins standard, and incorrectly found that Chase is not intellectually disabled and exempt from execution.[5] Second, this and other recent Atkins cases have convinced me that our existing Atkins standard and procedures are inadequate to alleviate the Eighth Amendment concerns implicated when an intellectually impaired offender faces potential capital punishment.
I. The circuit court applied a flawed legal standard.
¶ 80. The circuit judge discredited Dr. Reschly’s testimony for doing exactly what this Court has instructed him to do. Dr. Reschly relied on interviews with Chase’s family and teachers. Our decision in Goo-din v. State established that those interviews are an important component in a retrospective Atkins evaluation.[6] So, clearly, the circuit judge disregarded our precedent and employed a flawed legal standard that required Dr. Reschly to base his opinions on the circuit judge’s own subjective standards.
¶ 81. To fully appreciate this error, one must view it in light of the circuit judge’s ruling as a whole. The circuit judge found that Chase failed to meet his burden to show the existence of adaptive functioning deficits. Why? Not because the circuit judge found the State’s evidence more convincing. Instead, for at least one legally invalid reason, he discredited Dr. Reschly’s findings and rejected them wholesale.
¶ 82. The circuit judge reached that conclusion largely because Dr. Reschly relied on interviews with Chase’s family, teachers, and others who knew him prior to age eighteen to assess Chase’s adaptive functioning. The circuit judge found such sources inherently biased, and, in turn, found Dr. Reschly’s acceptance of their statements biased. He also found that Dr. Reschly’s report failed to present a methodology for questioning those witnesses.
¶ 83. The circuit judge’s inherent distrust of these sources sits in stark contrast to professional standards, and to our precedent which specifically endorses interviews with family and others who knew the accused prior to age eighteen. In Goodin, this Court stated that “because the definitions of mental retardation require onset before age eighteen, when evaluating anyone over the age of eighteen — or not— some type of retrospective analysis must be employed.”[7] To that end, we stated:
*489 This Court has noted the importance of interviewing family and friends knowledgeable about the defendant’s past. Interviews with educators or others in the community familiar with the defendant’s behavior before age eighteen also would provide valuable information. Adaptive-functioning tests may be administered to these individuals as well. A retrospective evaluation also could include a thorough review of school records, social history, and work history, among other things.[8]
¶ 84. So this Court has acknowledged that family, friends, and educators are important resources to assess adaptive functioning. The circuit judge disregarded that principle of law when he found those sources inherently biased, especially given that the record lacks any indication that any witness lied. Simply put, the circuit judge’s ruling was not based on any finding that a particular witness was biased, but rather on a finding that statements from this particular class of witnesses were biased and unreliable. This was legal error.
¶ 85. To be sure, our precedent does not require the circuit judge automatically to accept all information derived from family members, teachers, and friends from the past. But our precedent does preclude a finding that information from such sources is inherently unreliable.
¶ 86. Further, the circuit judge simply was incorrect when he found that Dr. Reschly provided no methodology for judging the credibility of those informants. In his report, Dr. Reschly explained that the primary measure of credibility for third-party informants is the convergent validity principle, a recognized principle that was unchallenged by the State. The examiner must look for consistency in the information received from multiple sources or through multiple methods to justify his reliance on that information. And, in the evidentiary hearing, Dr. Reschly testified that he observed that consistency across his sources. This too was error, which the majority concedes along its road to affirm. And these errors are compounded by the fact that the circuit judge readily accepted Dr. Macvaugh’s opinions, despite the fact that Dr. Macvaugh never conducted a sin-. gle third-party interview, which we deemed so vital in Goodin.
¶ 87. Also, Dr. Reschly found evidence of a lack of social responsibility in Chase’s claim that he had reason to believe he had fathered a child with an unknown woman. The circuit judge — with no basis in scientific literature or expert opinion to support his conclusion — found that this was not appropriate scientific evidence of an adaptive functioning deficit. I do not wish to be misunderstood on this point. The circuit judge did not find one expert more credible than another. He simply disagreed with a scientific principle stated by Dr. Reschly, a professor of psychology at Peabody College of Vanderbilt University; a permanently licensed school psychologist in Arizona and Iowa with a bachelor’s degree from Iowa State University, master’s degree from the University of Iowa, and Ph.D. from the University of Oregon; having studied in the field of intellectual disability “particularly the psychological aspects of mental retardation systematically since 1967;” and having been active in the American Psychological Association’s division devoted to developmental disabilities and intellectual disabilities “for about twenty years.”
¶ 88. Further, the circuit judge simply was incorrect when he attacked Dr. Reschly’s finding that Chase fabricated stories *490 about sexual exploits to appear normal because “he did not appear to corroborate any of these allegedly ‘made up stories,’ but rather simply decided himself what was and wasn’t possible.” Contrary to the judge’s assertion, both Dr. Reschly’s report and his testimony explain that he confirmed that Chase had never been expelled from school for having sex on campus as he claimed by asking one of Chase’s teachers and his principal.
¶ 89. The circuit judge also criticized Dr. Reschly’s use of Chase’s mistaken belief that he is not culpable for his crime because accomplice liability is, in the judge’s view, a difficult subject to understand “even [for] those with legal training.” But Dr. Reschly did not find a deficit in Chase’s failure to understand the nuance of his culpability as an accomplice, but rather Chase’s view that he had done nothing wrong despite the fact that he had admitted to assisting and encouraging a murder. As Dr. Reschly explained, understanding culpability requires abstract reasoning, and the absence of that reasoning indicates an adaptive functioning deficit.
¶ 90. Similarly, the circuit judge found that “Dr. Reschly assigned deficits to Chase’s fairly short work history, and that his mother still bought him clothes and gave him money. However, he did not believe it relevant to this finding that Chase was 16-19 through his work history.” But in actuality, Dr. Reschly found that Chase’s ‘ work history evidenced an adaptive functioning deficit not because it was short, but because he concluded that Chase repeatedly had lost jobs because of his inability to perform his job functions. And Dr. Reschly focused not on the fact that Chase’s mother bought clothes for him, but on the fact that he was “excessively dependent on Mrs. Chase, who carefully directed and monitored Mr. Chase’s dress, hygiene, and grooming.” For example, she had to select his clothing for him when he was in high school.
¶ 91. Further, the circuit judge’s troubled attempt to apply our Atkins standard extended to his analysis of the first criterion: subaverage intellectual functioning. As the majority concludes, “the circuit court clearly erred by crediting Dr. Mae-vaugh’s unsupported allegations of malingering that conflicted with the results of the TOMM and by finding that Chase had failed to meet his burden of proof of significantly subaverage intellectual functioning.”
¶ 92. In sum, the circuit judge discredited Dr. Reschly’s testimony wholesale, largely because Dr. Reschly relied on sources of information that this Court has found important in Atkins evaluations. That was legal error. And the trial judge compounded his error by undermining Dr. Reschly’s scientific analysis .with rebukes that were unsupported in the evidence. Because of this error, we should reverse the circuit judge’s ruling and, at a minimum, remand this case to the circuit judge for new findings.
II. Chase is intellectually disabled.
¶ 93. Though the circuit judge’s legal error requires reversal, our inquiry cannot stop there, because Chase contends that the overwhelming weight of the evidence shows that he is intellectually disabled and exempt from execution. Under our current caselaw, Chase bore the burden to prove by a preponderance of the evidence that he has subaverage general intellectual functioning evidenced by an IQ of seventy-five or lower (criterion 1); significant limitations in adaptive functioning in two or more of the areas of communication, self-care, community use, self-direction, health and safety, functional academics, leisure, and work (criterion 2); and manifestation *491 prior to age eighteen (criterion 3).[9] In my opinion, the overwhelming weight of the evidence shows that Chase met that burden.

Criterion A

¶ 94. To establish the first criterion, Chase had to show that he possesses sub-average intellectual functioning.[10] A petitioner’s intellectual functioning is measured in terms of IQ and defined as a full-scale IQ at or below 75.[11] A showing must also be made that the petitioner was not malingering during testing — that is, intentionally scoring lower than he is capable of scoring to obtain a secondary gain.[12]
¶ 95. Chase has been administered two IQ tests. In 1989, Chase took the Wech-sler Adult Intelligence Scale Revised and scored a full-scale IQ of 71. In 2010, Chase took the Wechsler Adult Intelligence Scale Fourth Edition and obtained a corrected full-scale IQ of 71. Dr. Reschly explained that Chase was given a test to measure malingering with the 2010 exam, and that the test showed no indication of malingering. These facts were undisputed in the evidentiary hearing. So Chase indisputably established the first criterion.

Criterion B

¶ 96. Chase next had to establish the existence of two or more adaptive functioning deficits.[13] This prong has been satisfied as well.

Communication

¶ 97. During his interview with Chase, Dr. Reschly found Chase’s use of language “repetitive, rambling, directionless, and without clear purpose.” He noted that Chase often failed to complete sentences or rambled across several unrelated topics in a single sentence. This made his speech difficult to follow. Dr. Reschly also found that Chase would make illogical or improbable statements. One example is Chase stating: “My sister, you gotta catch her, she works all the time, like a kangaroo.” Dr. Reschly explained that Chase’s difficulties with language were closely related to his limited abstract reasoning. And people who knew Chase during high school explained that he frequently would fail to understand the content of a conversation.
¶ 98. Chase possesses very basic literacy in the twentieth percentile. Dr. Reschly opined that scoring in the twentieth percentile does not exclude a diagnosis of intellectual disability. Dr. Macvaugh opined that intellectually disabled individuals usually do not score that high. But Dr. Reschly found that Chase’s actually functioning fell short of the literacy levels his test scores revealed. He explained that Chase’s reading and writing were above average for a person with an intellectual disability, but significantly below an average person. For instance, several people claimed that Chase struggled to read and understand simple instructions, like those on a macaroni box.
¶ 99. The state hospital also administered the Wide Range Achievement Test, Revision Four. On that test, Chase scored in the nineteenth percentile — 9.6 grade equivalent — in word reading; the eighteenth percentile — 10.4 grade equivalent— in sentence comprehension, the twenty-fifth percentile — 10.3 grade equivalent — in spelling; the tenth percentile — 5.7 grade equivalent — in math computation, and the *492 fourteenth percentile reading composite score.[14]
¶ 100. Given this overwhelming evidence, I would find that Chase established an adaptive functioning deficit in communication.

Self-Care/Self-Direction/Home-Living

¶ 101. Chase’s mother reported that Chase always had struggled to understand directions. She explained that he needed more supervision than her other children and that he had to be guided directly. Chase expressed that he depended on the judgment of his girlfriend to make good decisions and keep him out of trouble. In fact, Chase’s mother directed and monitored his hygiene and grooming. Even in high school,-his mother had to pick out his clothes for him. And a friend reported that Chase once attempted to cut his own hair, resulting in it looking bad, but he was oblivious about how bad it looked.
¶ 102. Chase’s mother reported that he was difficult to toilet train, and that he reached most early-childhood-development landmarks later than her other children. Chase explained that, whilé incarcerated, he washes his clothes in his cell toilet instead of using the prison laundry or the sink in his cell. Chase also admitted that he cannot keep up with his prison commissary account. Chase also suffers from high blood pressure, but he refuses to take his blood-pressure medication because he believes that he will become dependent on it. Chase has also, while incarcerated, attempted suicide by hanging in his cell. None of this evidence was refuted. So, I would find that Chase also established a deficit in this area.

Social/Interpersonal Skills

¶ 103. People interviewed by Dr. Reschly reported that Chase often told improbable stories to fit in socially. Dr. Reschly explained that Chase used these stories to cover up his failures, such as explaining that he was expelled from school for having sex when he actually dropped out because of his academic struggles. People who knew Chase in high school reported that Chase would continue to tell those stories, despite a negative reaction from his peers. And Chase had little interaction with his peers during his teen years, preferring to interact with children younger than himself.
¶ 104. People who knew Chase from his school years suggested that he stuck out because he was so intellectually slow. Chase often gave money away in what one person described as an attempt to buy friends. And several people reported that Chase was often easily led into trouble by others. Dr. Reschly opined that Chase struggled to understand social responsibility. Chase’s civics teacher reported that Chase received an F in his class because he could not understand the basic obligations of a citizen. Chase also believes he may have fathered a daughter with a woman he does not know. So Chase established an adaptive functioning deficit in the absence of contrary evidence.

Functional Academic Skills

¶ 105. Chase struggled in school as a child. His teachers reported that he need *493 ed a great deal of help and had difficulty understanding abstract information. Several teachers stated that Chase needed to be in special education, but was not, because special education classes were not available while he was in school. But Dr. Macvaugh confirmed with Hazlehurst Schools that special education became available in 1985, the year Chase dropped out. His teachers also explained that, despite the fact that Chase gave good effort in school, he was unable to understand things that the other children could. Chase was described as one of the lowest students in his classes and received mostly Ds and Fs in his later school years.
¶ 106. Chase’s transcript reveals that, while he progressed through school grades,- his performance continually dropped. Dr. Reschly explained that this is a common characteristic of those with intellectual disability. Chase was retained in the tenth grade and dropped out of school during the second nine weeks of his second tenth-grade year. Dr. Macvaugh opined that intellectually disabled individuals usually do not reach the tenth grade. Dr. Reschly noted that in the ninth grade, Chase obtained only three and a half out of a potential six to eight credits toward graduation, and in tenth grade none at all. I would find that the evidence shows a deficit in this area.

Work

¶ 107. In his high-school trade class, Chase struggled to use basic tools like saws, chisels, and hammers. He would attend that class and watch others work, but he never completed any projects himself. Chase’s girlfriend’s mother reported that, at age sixteen, Chase could not change a lightbulb for her. According to his social security records, from January 1985 until December 1989, Chase had eight different jobs and earned less than three hundred dollars from six of those. Several people explained that Chase often lost those jobs because he could not adequately perform his duties. This undisputed evidence establishes an adaptive functioning deficit in this area.
¶ 108. Based on this evidence, Dr. Reschly opined that Chase had the necessary adaptive functioning deficits to satisfy the second prong of Chase. Dr. O’Brien agreed. Employing our de novo review in light of the circuit judge’s legal error, we agree and find that Chase’s largely undisputed evidence established two or more adaptive functioning deficits by a preponderance of the evidence. Though Dr. Mac-vaugh disagreed with that conclusion, he did so without the benefit of the necessary third-party interviews from Chase’s developmental years, which present most of the evidence of adaptive functioning deficits. So Chase satisfied the second prong.

Criterion C

¶ 109. Finally, Chase had to establish that his deficits manifested prior to age eighteen.[15] All of the third-party informants whom Dr. Reschly interviewed knew Chase prior to that age. Further, the experts in this case relied on information from Chase himself, describing conduct from before age eighteen. Finally, while the experts disputed whether Chase had adaptive functioning deficits, no expert ever suggested that he had deficits that manifested later than age eighteen. So I would conclude that the undisputed evidence shows that Chase’s adaptive functioning deficits manifested prior to age eighteen.
¶ 110. Because I believe that the overwhelming weight of the evidence shows that Chase satisfied all three prongs of the Chase criteria, I would find that he is *494 intellectually disabled and exempt from execution.
III. Our Flawed Atkins Standard
¶ 111. While the foregoing explanation expresses my belief that the record shows that Chase was entitled to relief under our current Atkins standard, the record in this case also reveals a far more pernicious concern. None of the dispute between the experts at trial, the parties on appeal, or between the majority opinion and this dissent bears any relevance to the Eighth Amendment concerns which significantly guided the Atkins decision and required this Court to adopt an Atkins-related standard and procedure in the first place. I am concerned that neither the experts, nor the circuit judge; nor the parties, nor this Court has considered the appropriate Eighth Amendment questions. For that reason, I have come to believe new Atkins standards may be needed.
¶ 112. When the Atkins court exempted the intellectually disabled from execution under the Eighth Amendment to the United States Constitution, it did so based in part on specific concerns related to the diminished capacity of those offenders, and their relation to the judicial process.[16] The Court noted the risk of “false confessions;” a lesser ability on the part of the offender to “make a persuasive showing of mitigation in the face of the prosecutorial evidence of one or more aggravating factors;” reduced ability to “give meaningful assistance to their counsel;” and reduced ability to be good witnesses because “their demeanor may create an unwarranted impression of lack of remorse for their crimes.”[17] The Supreme Court also buttressed a growing national consensus against executing the intellectually disabled with its conclusion that neither of the penological purposes of the death penalty — retribution and deterrence — was served by their execution.[18]
¶ 113. But, rather than articulate-a legal standard to determine who presented these concerns, the Court delegated that responsibility to the states.[19] In response, in Chase, we adopted a mental health definition associated with that label, which the Atkins Court cited but did not require.[20] Our Chase decision failed to take into account the fact that mental health professionals who articulate these definitions and change them over time bear no obligation to consider the legal concerns of the Eighth Amendment when they do so. The fact is, under our application of Atkins in Chase, offenders may be eligible for execution simply because we apply irrelevant characteristics for Eighth Amendment purposes, such as manifestation prior to age eighteen. For instance, a person at age thirty, but before his crime, who suffers a brain injury that results in a 60 I.Q. and severe deficits in two or more areas of social function, is currently eligible to be sentenced to death, simply because his mental disability did not manifest prior to age eighteen. But his current mental state is exactly the same as a person who is not eligible for that sentence because his condition did manifest prior to age eighteen. While manifestation prior to age eighteen may be significant in acquiring the mental health label of intellectual disability, it is wholly insignificant with re *495 spect to the Eighth Amendment concerns voiced by the Atkins Court.
¶ 114. This system is arbitrary on its face, and we should consider a judicial definition of intellectual disability that meets constitutional concerns. Our approach should be to exclude from the death penalty only those who raise true constitutional concerns, rather than those who meet the mental health community’s views of what it means to be intellectually disabled for their diagnostic purposes.
WALLER, C.J., AND KING, J., JOIN THIS OPINION.

. Atkins v. Virginia, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002); Chase v. State, 873 So.2d 1013 (Miss.2004).

. Goodin v. State, 102 So.3d 1102, 1115 (Miss.2012) (quoting Doss v. State, 19 So.3d 690, 714 (Miss.2009)).

. Goodin, 102 So.3d at 1114 (citing Thorson v. State, 76 So.3d 667, 672 n. 8 (Miss.2011)).

. Goodin, 102 So.3d at 1115 (citing Doss, 19 So.3d at 714) (emphasis added).

. Chase, 873 So.2d at 1027-28.

. Id. at 1028.

. Id.

. Id.

. Id.

. I stop here to note that the majority incorrectly concludes that the experts in this case failed to employ sufficient normed data in their respective adaptive functioning analyses. Each relied on the normed results of the Wide Range Achievement Test. What is more, the majority imposes a new legal requirement on Atkins evaluations — that every evaluation must, as a matter of law, include normed tests — which did not exist when Chase prepared for the evidentiary hearing in this case. If the majority wishes to impose this new legal requirement, due process demands that Chase be given an opportunity to present that evidence in a new evidentiary hearing.

. Chase, 873 So.2d at 1028.

. Atkins, 536 U.S. at 317-21, 122 S.Ct. 2242.

. Id. at 318-21, 122 S.Ct. 2242.

. Id.

. Id. at 317, 122 S.Ct. 2242 (citing Ford v. Wainwright, 477 U.S. 399, 106 S.Ct. 2595, 91 L.Ed.2d 335 (1986)).

. Chase, 873 So.2d at 1027-28.