*328 MAXWELL, J.,
for the Court:
¶ 1. Since 1999, Eric LaQuinne Brown has been serving a life sentence for the murder of his girlfriend and a twenty7year sentence for the manslaughter of his unborn child. In 2014, he filed his fourth motion for postconviction relief (PCR). In his latest motion, he cites a 2009 Mississippi Supreme Court case, Sanders v. State, 9 So.3d 1132, 1136 (¶ 16) (Miss.2009), to argue his convictions must be reversed. He insists, under Sanders, -his fundamental rights were violated because the trial court did not conduct an on-the-record competency hearing before accepting his plea, despite having ordered Brown to undergo a psychological exam. But Sanders and its progeny do not apply retroactively to undo Brown’s 1999 guilty plea.
¶2. What the record shows is that Brown was in fact deemed competent by the psychologist who evaluated him. And the record shows the trial judge indeed considered the psychologist’s report, and questioned Brown about his competency, before accepting Brown’s guilty plea. Furthermore, neither Brown nor his counsel ever asserted Brown was incompetent to, stand trial. So from- the face of Brown’s own motion and the underlying criminal record, Brown failed to show the absence of a formal competency hearing led to a denial of his due-process rights. We thus affirm the dismissal of this PCR claim.
¶ 3. Because Brown also failed to produce any “newly discovered evidence” to overcome the successive-writ and time-bars, we also affirm the dismissal of his other claims.
Background Facts and Procedural History

I. Murder of Shorelanda and Her Unborn Child

¶ 4. In January 1999, Brown was involved in two relationships with two different women. One of those women was Tennille Brown, his wife, with whom he had at least one child. The other was Shorelonda Moore, his girlfriend. Brown and Shorelanda already had one child together. And Shorelanda was several months pregnant with another of Brown’s children. Tennille and Shorelanda did not get along, and the situation was stressful for Brown. In early January 1999, Brown allegedly spoke with friends about getting rid of Shorelanda, as she was causing trouble between him and his wife.
' ¶ 5. On January 22, the situation came to a head. The day of the murder, Brown called Shorelanda at her job at McDonald’s several times. Witnesses told law enforcement that Brown and Shorelanda made plans to meet once she got off work. Sho-relanda believed they were going to spend the weekend together in Memphis, Tennessee. Brown admitted to law enforcement he met Shorelanda behind a restaurant in Pontotoc after she got off work. The two sat in Shorelanda’s car, as they often did. But that day their conversation took a dark turn. Shorelanda and Brown began arguing because Shorelanda was upset that Brown had married Tennille only a few days earlier. As the argument escalated, according to Brown, he began to shake her. Soon, Shorelanda was unresponsive.
¶ 6. Brown returned- home and told Tennille he had • killed Shorelanda. He then told his wife they were leaving for Memphis to ditch Shorelanda’s body. Tennille put the children in the car, and Brown loaded a five-gallon gas can in the trunk. Tennille dropped Brown off at Shorelanda’s car and followed Brown as he drove Shorelanda’s body to Memphis. Once in Memphis, he drove Shorelanda’s car' down an alley. He parked the car, used the gas can he had brought from *329 Pontotoc to douse the vehicle, and set it and Shorelanda’s body on fire.
¶7. Early the next day, a man found Shorelanda’s car smouldering in the alley. Memphis police discovered Shorelanda’s body in the car. Her pants and underwear were pulled below her hips. Her shirt and bra were pulled up, and her bra was partially around her throat. The medical examiner later determined Shore-landa’s cause of death was strangulation. The ligature marks on her neck matched the pattern of her bra. Medical examiners also determined Shorelanda was approximately twenty-eight weeks pregnant.
¶ 8. Law enforcement quickly caught up with Brown. Both he and Tennille spun a story about being in Tupelo. But that was determined to be a lie. Tennille eventually gave several statements to officers, each incriminating her and her husband in some way. Police found physical evidence that incriminated Brown. And eventually, Brown gave a voluntary statement to law enforcement. Both. Brown and Tennille .were indicted for Shorelan-da’s murder and the manslaughter of her unborn child.

II. Psychological Evaluation

¶9. On July 20, 1999, Brown filed a motion for psychiatric assistance. He claimed he intended to use the psychiatric report as mitigation should he be convicted and to determine if he was able to form the necessary intent for murder. Significantly, Brcmn’s motion did not claim he was presently incompetent. The trial court ordered Brown to undergo an examination at the Mississippi State Hospital. This exam was to assess his mental capability to stand trial, his need for inpatient hospitalization, and for the hospital to do a psychological exam. The order did not state that reasonable grounds existed to believe Broiun was presently incompetent. This exam never occurred because Brown’s attorney failed to give the hospital the requested and required materials.
¶ 10. On November 12, 1999, the State filed for a psychiatric examination to determine if Brown was competent to stand trial, able to discern the difference between right and wrong, able to form the necessary intent, and if “under the conditions he suffered' whether malice could be implied ‘where no considerable provocation appears.’ ” The State further noted Brown had claimed past mental illnesses and had indicated a “mental-type” defense would be used in his trial. The trial judge ordered Brown undergo an evaluation to be performed by Dr. Criss Lott.
¶ 11. Dr. Lott conducted his exam on November 14, 1999. And he found to a reasonable degree of psychological certainty that Brown had “the sufficient present ability to confer with his attorney with a reasonable degree of rational understanding and he has a good factual and rational understanding of the nature and object of the legal proceedings against him.”

III. ■ Plea Colloquy

¶ 12. On November 29, 1999, Brown pled guilty to both murder and manslaughter charges. At the plea hearing, Brown denied being under the influence of drugs or alcohol. He denied being treated for any drug or alcohol abuse. And he specifically denied he was suffering any psychiatric illness or mental disease. Brown told the judge he understood the nature of the charges against him and the consequences of pleading guilty.
¶ 13. The State relayed, at length, the factual basis of the crimes and the evidence the State would prove at trial. The trial judge asked Brown if the State’s evi-dentiary proffer was substantially correct. Brown answered that it was.
*330 ¶ 14. The trial judge asked Brown if he understood what was taking place that day. And Brown said he did. Brown did not have any questions about the day’s proceedings, nor did he have any questions for the judge. Nothing from the hearing transcript indicates the trial judge should have been alerted Brown might be suffering from mental issues.
. ¶ 15. The State also noted for the trial court that Brown’s attorney had filed for a psychiatric -exam, and after that exam, Brown had been found competent to stand trial. The trial judge mentioned he had seen a copy of the doctor’s report. And he asked the State to ensure a copy would be filed in the court’s .file after the proceedings had concluded. Neither Brown nor his attorney voiced any concerns or objections to the ' conversation involving Brown’s prior competency determination. The trial judge then. found that Brown “knowingly, understandingly, freely and voluntarily” pled guilty. The judge sentenced Brown to serve a life sentence for the murder of Shorelanda and to serve twenty years for the manslaughter of their unborn child, with both sentences to run concurrently.

IV. Postconviction Filings

¶ 16. Fifteen years have passed since Brown’s guilty plea. Since then, Brown filed three PCR motions with the trial court, one of which was appealed to this court. Brown v. State, 907 So.2d 979, 981 (¶ 9) (Miss.Ct.App.2005) (finding Brown’s motion both subsequent-writ and time-barred). He has also filed no fewer than five motions in the Mississippi Supreme Court seeking various relief, all of which have been denied or dismissed. Brown v. State, 2000-CP-01799 (order dismissing case dated Mar. 22, 2001); Brown v. State, 2002-M-01821 (order denying motions dated Jan. 21, 2004); Brown v. State, 2012-M-01132 (order denying motions dated Sept. 19, 2012); Brown v. State, 2013-M-02102 (order denying motion dated Jan. 23, 2014).
¶ 17. The present appeal is from the dismissal of Brown’s fourth PCR motion, filed in February 2014. In .this motion, Brown claims for the first time the lack of a competency hearing was a violation of his due-process rights. He also suggests he has “newly discovered evidence.” Finally, he claims there was an insufficient factual basis for the trial court to accept his guilty plea.
Discussion
¶ 18. Brown concedes his present PCR motion is well outside the three-year time-bar and is successive. See Miss.Code Ann. § 99-39-5(2) (Supp.2014); Miss.Code Ann. § 99-39-23(6) (Supp.2014). But he asserts these bars do not apply due to the “fundamental rights” exception of Rowland v. State, 42 So.3d 503, 507 (¶ 12) (Miss.2010), and because he has newly discovered evidence, Miss.Code Ann. § 99-39-5(2)(a)(i); Miss.Code Ann. § 99-39-23(6).
J. Lack of a Competency Hearing
¶ 19. Brown is correct that the due-process right not to stand trial or be convicted while incompetent is a fundamental right not subject to the procedural bars of the Mississippi postconviction-relief statutes. See Smith v. State, 149 So.3d 1027, 1031 (¶ 8) (Miss.2014) (citations omitted). But having evaluated the merits of Brown’s allegations, we find he has failed to establish a claim that this right was violated. See Smith v. State, 129 So.3d 243, 245 (¶ 5) (Miss.Ct.App.2013) (citation omitted) (“We affirm dismissals or denials of PCR motions when the movant fails to demonstrate a claim procedurally alive substantially showing the denial of a state or federal right.”).
*331 ¶20. In arguing his conviction must be vacated due to the lack of a formal competency, hearing, Brown relies on the 2009 Mississippi Supreme Court ruling in Sanders, 9 So.3d at 1136 (¶ 16). In that opinion, the supreme court strictly interpreted Uniform Circuit and County Court Rule 9.06[1] to mandate a competency hearing in. every case where the trial eourt has ordered .a psychological exam. Sanders, 9 So.3d at 1136 (¶ 16). Brown reasons that, since he underwent a court-ordered mental exam, the trial court had to conduct a formal competency hearing before accepting his guilty plea. And the court’s failure to do so entitles-him to a new trial.
¶ 21. But Sanders and the later' eases that have relied on Sanders[2] do not apply to Brown’s 1999 guilty plea because they are not retroactive.
¶ 22. In Teague, the United States Supreme'held a new rule of constitutional law will not be applied retroactively to' a cáse on Habeas review unless it falls within one of two limited exceptions:
The first exception [is] that a new rule should be applied retroactively if it places certain kinds of primary, private individual conduct beyond the power of the criminal law-making authority to "proscribe[,] ... The second exception [is] that á new rule Should-be applied retroactively if it requires the observance of those procedures'that ... are implicit in the concept of ordered liberty.
The Supreme Court later pointed out in Sawyer v. Smith, 497 U.S. 227, 234, 110 S.Ct. 2822, 111 L.Ed.2d 193 (1990), that “[t]he principle announced in Teague serves to ensure that gradual developments in the law over which reasonable jurists may disagree are not later used to upset the finality of state convictions valid when entered.”
- ¶ 23;' Our state supreme court adopted the Teague analysis in Manning v. State. As our supreme court put it, “we take this opportunity to expressly state that in the future this Court will continue to apply the very limited retroactive application standard set forth by the United States Supreme Court in Teague v. Lane [489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989)].” Manning v. State, 929 So.2d 885, 900 (¶ 42) (Miss.2006). In Manning, the court discussed in-def)th' the United States Supreme' Court’s holdings in both Teague and Schriro v. Summerlin, 542 U.S. 348, 124 S.Ct. 2519, 159 L.Ed.2d 442 (2004). The Schriro Court delineated a distinction between substantive and procedural rules and their "retroactive applicability, explaining:
When a decision of this Court results in a “new rule,” that rule applies to all criminal cases still pending on direct review. As to convictions that are already final, however, the rule applies only in limited circumstances. NeW substantive rules generally apply retroactively. This includes decisions that narrow the scope of a criminal statute by interpreting its terms ... as well as constitutional determinations that place particular conduct or persons covered by the statute beyond the State’s power to punish. Such rules apply retroactively because they necessarily carry a significant risk that a defendant stands con *332 victed of an act that the law does not make criminal or faces a punishment that the law cannot impose upon him. New rules of procedure, on the other hand, generally do not apply retroactively. They do not produce a class of persons convicted of conduct the law does not make criminal, but merely raise the possibility that someone convicted with use of the invalidated procedure might have been acquitted otherwise. Because of this more speculative connection to innocence, we give retroactive effect to only a small set of watershed rules of criminal procedure implicating the fundamental fairness and accuracy of the criminal proceeding.. That a new procedural rule is “fundamental” in some abstract sense is not enough; the rule must be one without which the likelihood of an accurate conviction is seriously diminished. This class of rules is extremely narrow[.]
Schriro, 542 U.S. at 351-52, 124 S.Ct. 2519 (emphasis added and internal quotations and citations omitted).
¶ 24. A rule is substantive if it “alters the range of conduct or the class of persons that the law punishes,” whereas a rule is procedural if it “regulate[s] only the manner of determining the defendant’s culpability.” , Id. at 353, 124 S.Ct. 2519. In Sanders, the supreme court interpreted Rule 9.06 to mandate a formal competency hearing “once a trial court orders a psychiatric evaluation to determine competency to stand trial.” Sanders, 9 So.3d at 1136 (¶ 16). Because this ruling was procedural in nature, it does not apply retroactively.
¶25. The Sanders rule did not change the “range of conduct” punishable by statute. Nor did it suddenly place Brown in a category of persons who could not be punished by law. The Sanders ruling simply regulated the trial court’s procedure for determining a defendant’s competency. Additionally, the rulings of Sanders and its progeny could hardly be considered a “watershed” rule of criminal procedure. The strict interpretation of Rule 9.06 did not make prior cases involving competency issues fundamentally unfair, and it did not affect the. accuracy of criminal proceedings. As the U.S. Supreme Court noted in Schriro, the class of procedural rules applied retroactively should be construed extremely narrowly. Schriro, 542 U.S. at 352, 124 S.Ct. 2519. It is paramount to limit retroactive application of new rules so as to not “upset the finality of state convictions” that were valid when entered. Sawyer, 497 U.S. at 234, 110 S.Ct. 2822,
¶ 26. In this case, to apply Sanders, retroactively to Brown — as the dissent suggests we should — would require the trial judge to have been clairvoyant in 1999 and accurately predict what the Mississippi Supreme Court would do ten years later in Sanders.[3]
*333 ¶ 27. Also, Brown had been determined competent under the Dusky standards[4] by a competent psychologist. And the judge, defense counsel, prosecutor, and Brown knew that at the plea hearing.
¶28. Competency is to be presumed until the defendant proves by “substantial' evidence that [he] is mentally incompetent to stand trial.” Evans v. State, 725 So.2d 613, 660 (¶ 180) (Miss.1997) (quoting Medina v. California, 605 U.S. 437, 448, 112 S.Ct. 2572, 120 L.Ed.2d 353 (1992)). Defense counsel never raised the issue of Brown’s competency. And his motion for a mental exam dealt solely with Brown’s mental ability to- form the necessary intent to commit murder. Nothing occurred during the plea hearing to raise any issues about Brown’s competency. And any possible doubt of Brown’s competency was resolved when a licensed psychologist found him to be competent after a thorough examination.
¶29. Further, defense counsel raised no objection to proceeding without a formal hearing. And had some sort of formal competency hearing occurred, it is reasonable to conclude the State would have introduced Dr. Lott’s written report into evidence. Defense counsel would have voiced no objection, as he did not object during the plea hearing. The State and defense would have then rested. This is particularly so since Brown had sworn under oath that he had never been treated for any mental disease or psychiatric illness and fully understood what was occurring in the courtroom. Under sdch circumstances, mandating a formal competency hearing before proceeding with a guilty plea would be placing form over substance.
¶30. Brown’s guilty plea was valid when entered. He was informed of all of the rights he forfeited by pleading guilty. A factual basis of the crimes was recited. And he was told the minimum and maximum sentences he faced by pleading guilty. He told the trial judge he was not under the influence of drugs or alcohol. Brown maintained he was satisfied with his. attorney’s performance and advice. And he represented that he had not been threatened or coerced into pleading guilty. Importantly, Brown denied any history of mental disease or psychiatric illness. And neither he nor his attorney voiced any objections to the State’s statement. that Dr. Lott found Brown to be competent. Having heard this, and personally observing Brown’s demeanor in court, the judge found Brown’s plea to be knowing, voluntary, and intelligent. And now, fifteen years later, Brown presents no persuasive reason for us to doubt the trial judge’s finding.

II. “Newly Discovered Evidence ”

¶ 31. Alternatively, Brown asserts he is entitled to relief based on “newly discovered evidence.” Following his convictions, Brown sued three Pontotoc police officers involved in his arrest. See Brown v. Sudduth, 675 F.3d 472 (5th Cir.2012). According to Brown, certain facts came to light during the 2008 federal civil trial that, had *334 he had known them back in 1999, he would not have pled guilty,
¶ 32. Setting aside the fact Brown waited six years after this trial to file his “newly discovered evidence” claim, none of this evidence meets the definition of “newly discovered.” “The term ‘newly discovered evidence’ refers to evidence, that is, an exhibit, testimony, or some other information that could have been offered as evidence in the defendant’s trial but was not offered because it was not reasonably discoverable at the time of the trial.” Pickle v. State, 942 So.2d 243, 246 (¶ 12) (Miss.Ct.App.2006) (emphasis added); see also Miss.Code Ann. § 99-39-5(2)(a)(i) (requiring the defendant, to overcome the procedural bar, to demonstrate “he has evidence,' not reasonably discoverable at the time of trial, which is of such nature that it would be practically conclusive that, if it' had been introduced at trial, it would have caused & different result in the conviction or sentence” (emphasis added)); Miss,Code Ann. § 99-39-23(6) (same). And Brown has failed to show that the evidence he refers to as “new” was not reasonably discoverable in 1999.
¶ 33. Brown claims the first piece of “newly discovered evidence” arose when one of the officers testified at trial in the 2008 lawsuit. The issue in that suit was if and when the Pontotoc police had probable cause to arrest him. Brown, 675 F.3d at 475. The .arresting officer testified that, when the Pontotoc police first caught up with Brown and Tennille, it was ^till unclear where Shorelanda was murdered — in Pontotoc or Memphis. Id. at 478. The arresting officer testified during her initial detention Tennille gave a statement to Pontotoc police. And this statement led them to reasonably believe Shorelanda was already dead before Moore drove her car to Memphis, which is why the Pontotoc police were the ones who arrested Brown and Tennille for murder. See id.
¶ 34. In his PCR motion, Brown claims this was the first time he realized the police had relied on Tennille’s statement to establish the murder occurred in Pontotoc. Brown claims Tennille had lied to the police, when they first, questioned her — and both the police and prosecutor knew she had lied. And had he known the prosecution was relying on this “false” evidence, he would not have pled guilty. To support this claim, Brown points to a 1999 police report — a report he fails to prove was newly discovered — that says Tenille initially lied to cover for Brown before failing a polygraph and coming clean about his guilt in the murder. Though the report mentions nothing about the details of .Tenille’s initial false statement, Brown stretches the report, attempting to create a nonbarred claim. As he views it, the report’s general statement about Tenille’s initial protection of him is somehow proof she was lying when she admitted he had killed Shorelan-da in Pontotoc County. Thus, officers— knowing about this lie — arrested him without sufficient probable cause to arrest him for a Pontotoc County murder.
¶ 35. Even,if the circuit judge had accepted Brown’s theory, Brown fails to show how an initial lack of probable cause to arrest equates to his innocence in the murder case. As the Fifth Circuit put it in one of Brown’s several appeals of his federal lawsuit,.“it can hardly be said that the proof required to establish Brown’s unlawful arrest claim necessarily would imply the invalidity of his underlying murder conviction.” Brown v. Sudduth, 255 Fed.Appx. 803, 806 (5th Cir.2007) (unreported) (citing Brown v. Edwards, 721 F.2d 1442, 1448 (5th Cir.1984)). So his claimed newly discovered evidence is immaterial here. See Crawford v. State, 867 So.2d 196, 204 (¶ 9) (Miss.2003) (requiring showing that *335 newly discovered “evidence is material and is not merely cumulative or impeaching” in order to be granted a new trial). -
¶ 36. Still, evén in light of his claim'ed new evidence, the record shows Brown admitted to law enforcement he met.Sho-relanda behind the Pontotoc restaurant. And once inside Shorelanda’s car, the two began arguing about Brown recently marrying Tennille days earlier. According to Brown, he began to shake her, and Shore-ianda became unresponsive. There is also additional evidence Brown fails to consider. The Pontotoc McDonald’s manager had told an investigator that Moore had worked the previous day during which Brown had telephoned the restaurant several times. Brown, 675 F.3d at 475. Her manager also told the investigator that Brown' and Moore were to meet after Moore’s shift. Moore and Brown' had plans to leave town for the weekend. Id. Brown’s neighbor reported Brown was away from home that night, and officers did not find Brown at home Saturday morning. And Shorelanda’s strangled and burned body was still clothed in her McDonald’s uniform when discovered in Memphis. Id. So it is certainly not practically conclusive that, if Brown had opted for trial and pitched his supposed new evidence; it would have caused a different result in the conviction. See Crawford, 867 So.2d at 204 (¶ 10) (“Evidence is material only if there is a reasonable probability (i.e., ‘probability sufficient enough to undermine confidence in the outcome’) that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.” (quoting De La Beckwith v. State, 707 So.2d 547, 572 (Miss.1997))).
¶ 37. The judge was also not swayed by Brown’s second piece of alleged newly discovered evidence — a threatening letter from Shorelanda to Moore, which was part of the criminal file subpoenaed for the 2008 civil lawsuit. Brown claims, had- he known the police had this letter in their possession, he would.not have pled guilty. But by his own admission, Brown kiiew about the letter before he pled guilty. In fact, he asserts h¿ told the Pontotoc police about the letter’s existence back in 1999. So this evidence could have easily been discovered prior to trial.
¶ 38. Because, from the face of his motion, none of Brown’s “newly discovered evidence” was really newly discovered, the trial court did not err when it summarily dismissed this claim.

III. Factual Basis to Support Guilty Plea

 ¶ 39. Finally, Brown claims there was insufficient evidence to establish a factual basis for. his plea. See URCCC 8.04(A)(3) (requiring that, “[bjefore the trial court may accept a plea of guilty, the court must determine ... that there is a ■factual basis for this.plea”). Brown argues this claim also presents a fundamental-rights exception to the procedural bars under Rowland, 42 So.3d at 507 (¶ 12), because “a factual basis is an essential part of the constitutionally valid and enforceable decision to plead guilty,” Carter v. State, 775 So.2d 91, 98 (¶ 28) (Miss.1999) (citation omitted).
¶ 40. Bars or no bars, Brown’s no-factual-basis claim clearly lacks merit. Brown contends there was no factual basis for his plea because he never specifically admitted he strangled Shore-landa with a bra. But a factual basis is not insufficient simply because the defendant does not confess each gory detail of the crime. See Corley v. State, 585 So.2d 765, 767 (Miss.1991) (rejecting the defendant’s “view that only words spoken from his own mouth can form the requisite factual predicate”); see also Gazzier v. State, *336 744 So.2d 776, 779 (¶ 7) (Miss.1999) (“The law does not require that a defendant admit every aspect of a charge -against him. Instead, a guilty plea will be considered valid even though the defendant makes only a bare admission of guilt.*’).
¶41. Brown admitted he deliberately killed Shorelanda — the crime for which he was indicted. As part of the recitation of facts, the prosecutor told the court that Brown'had admitted he was in the car with Shorelanda behind the restaurant in Pon-totoc — a fact other witnesses confirmed. Brown also admitted he argued with Sho-relanda, that he shook her until she was no longer responsive, and that he then went home and told his wife that he had killed Shorelanda and needed to dispose of her body. Brown then drove Shorelanda’s body to Memphis, where he attempted to burn Shorelanda’s car. The police later discovered Brown’s discarded burnt clothing along the road between Memphis and Pontotoc. They also found' clippings of Brown’s singed hair, which he had trimmed off in his bathroom. And the autopsy report showed Shorelanda had been strangled and the ligature marks on her neck were consistent with her bra, which had'been pulled around her neck.
¶ 42. From this, we find a more-than-sufficient factual basis under Rule 8.04(A)(3) for the trial court to accept Brown’s guilty plea. Therefore, we affirm.
¶ 43. THE JUDGMENT OF THE PONTOTOC COUNTY CIRCUIT COURT DISMISSING THE MOTION FOR POSTCONVICTION RELIEF IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO PONTO-TOC COUNTY.
IRVING AND GRIFFIS, P.JJ., BARNES, ISHEE, FAIR AND WILSON, JJ., CONCUR. CARLTON, J., CONCURS IN RESULT ONLY WITHOUT SEPARATE WRITTEN OPINION. JAMES, J., DISSENTS WITH SEPARATE WRITTEN OPINION. LEE, C.J., NOT PARTICIPATING.

. Rule 9.06 directs that, ”[i]f before or during trial the court ... has reasonable ground to believe that the defendant is incompetent to stand trial, the court shall order the defendant to submit to a mental examination^]” And ‘‘[a]fter the examination the court shall conduct a hearing to determine if the defendant is competent to stand trial.[4]’ URCCC 9.06.

. Coleman v. State, 127 So.3d 161 (Miss.2013); Smith v. State, 149 So.3d 1027 (Miss.2014).

. The dissent notes that the supreme court applied Sanders retroactively in Goodin v. State, 102 So.3d 1102, 1118-19 (¶¶ 48-50) (Miss.2012), However,' in Goodin, the supreme court's application of Sanders dealt solely with the issue of Goodin's trial counsel’s performance under Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). The supreme court found that Goodin's attorney was deficient in not following the procedure set forth in Rule 9.06; the court made no finding as to the trial court's erro'rs in not conducting a competency hearing. Furthermore, Goodin involved a conviction for'capital murder. The supreme court
will review an appeal from a capital murder conviction and death sentence with "heightened scrutiny” under which all bona fide doubts are resolved in favor of the accused. Porter v. State, 732 So.2d 899, 902 (Miss.1999). Further, [the supreme court] is cognizant of the fact that what may be harmless error in certain situations *333 becomes reversible error where the penalty is death. Id.
Simmons v. State, 805 So.2d 452, 472 (¶ 26) (Miss.2001). The present case and Goodin are not analogous. '

. The standard for competency to stand trial set forth in Dusky v. United States is “whether [a defendant] has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding i.. and whether he has a rational as well as factual understanding of the proceedings against him.”. Dusky v. United States 362 U.S. 402, 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960) (per curiam).